## MAYNARD v. BROWN.

### Opinion delivered November 21, 1927.

1. REFORMATION OF INSTRUMENTS—WHEN RELIEF GRANTED.—Where, in reducing an agreement or transaction to writing, either through a mistake common to both parties, or through a mistake of the plaintiff accompanied by fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction, the instrument will be corrected,

só that it shall truly represent the agreement or transaction according to the purpose and intention of the parties.

2.  REFORMATION OF INSTRUMENTS—SUFFICIENCY OF PROOF.—In a suit for reformation of an instrument, the proof to support the relief must be clear, unequivocal and decisive.

3.  REFORMATION OF INSTRUMENTS—RELIEF FROM INEQUITABLE CONDUCT.—Where a note given for the purchase price of land bore interest from maturity, instead of from date, as intended by the parties, the note will be corrected to carry out the intention of the parties, where the purchaser alone noticed the mistake and failed to call the vendor's attention thereto.

Appeal from Pulaski Chancery Court; *Frank II. Dodge*, Chancellor; affirmed.

*Rose, Hemingway, Cantrell & Loughborough*, for appellant.

*John W. Newman*, for appellee.

MEHAFFY, J.   The appellee, plaintiff below, filed suit in the Pulaski Chancery Court, alleging that they sold to the defendant the land described in the complaint for $3,200, $500 of which was paid cash and the remainder evidenced by notes.   It is alleged that it was first agreed that the deferred payments should be evidenced by 90 notes of $30 each, bearing interest from date until paid at the rate of 7 per cent. per annum.   That these notes were evidenced by the deed, which was recorded.   That it was afterwards agreed that the deferred payments should be evidenced by one note of $1,500, due and payable March 20, 1927, and one note of $1,200 payable in installments of $30 per month, all bearing interest at the rate of 7 per cent. per annum from date until paid; that, in drawing the notes and deed to conform to the latter agreement, error was made in both the note and the deed, in that said $1,500 note was drawn to bear interest from maturity instead of from date; that said error was a mistake and oversight by all parties, and now appears in the deed which is recorded in the records of Pulaski County.

Plaintiffs state that they still own and hold the note and hold a lien against the land to secure the payment, and they ask for reformation of the note and deed so as

to show that the note bears interest from date instead of maturity.

The defendants answered, denying that it was first agreed that the deferred payments should be 90 notes of $30 each and bear interest from date until paid; denies that it was afterwards agreed that the deferred payments should be evidenced by one note of $1,500, due and payable March 20, 1927, and one note for $1,200, payable in installments of $30 per month, all bearing interest at 7 per cent. per annum from date until paid; denies all the material allegations in the complaint, and states that the deed of January 20, 1923, constituted the final and only complete transaction of sale, and that, so far as the defendant was concerned, it was not error or mistake. Alleges that plaintiffs were not in error, and no mistake was made. Asked that the complaint be dismissed.

The chancellor found for the plaintiffs, and decreed that the deed and note be reformed so as to show that the note for $1,500 bears interest at 7 per cent. per annum from date until paid.

The appellant, defendant below, testified, in substance, that he lives on the property; that he is now and for 14 years has been the chief engineer for the Arkansas Cold Storage Company. He had known Sullivan for years, and had inquired of Sullivan for residence property for sale. He was finally told of the property where he now lives, and he inspected the premises and decided that he would take it. That, at his request, Mr. Rose looked at the place, and advised that it was a good buy. This was between Christmas and New Year, 1922. A few days thereafter Sullivan was notified that witness would take the property. Sullivan called Brown, and, after a day or so, in which the papers were drawn, Maynard visited Brown and closed the deal. Witness asked Sullivan whether there had been any one with contagious diseases living in the house, and this was mentioned at the conference that night before Mr. Brown, and both Sullivan and Brown laughed, and answered in the nega-

tive. This was a few minutes after the cash payment had been made. There Maynard agreed to pay $500 cash and $30 per month until the property was paid out. After the $500 in cash was paid, Sullivan told witness that Brown would like an arrangement whereby a loan would be obtained in a building and loan association when witness had paid down to $1,500, and in this way give Brown the $1,500. Witness had never had much dealing in real estate, and thought this as good a thing as he could do, and agreed thereto, signing an agreement with Sullivan that he was to carry $1,700 fire insurance, and, when it was paid down to $1,500, it should be put in building and loan association and get him his money. Witness identified the original agreement of January 23, 1922, stated that he signed it and presented it to Mr. Brown, and this was introduced in evidence and is as follows:

"M. J. Sullivan & Son
Dealers in Real Estate
Little Rock, Arkansas.

"January 23, 1923.

"I agree to carry at least seventeen hundred and fifty dollars' fire insurance on house number 2322 Schiller Avenue, being lot 5, block 8, O. F. Shelton's addition to the city of Little Rock, Arkansas. In case of fire, John Brown and Amelia Ellen Brown are to receive the benefits of the insurance, as their interest may appear. I further agree that, when my notes are paid down to $1,500, to pay John Brown and Amelia Brown in full.

"Alex H. Maynard."

Witness did not sign ninety notes for $30 each at that time or any other time. If they were drawn he never saw them. No notes whatsoever were signed for the first transaction. The first deed was delivered to him for his inspection before the money was paid over, and he had same at such time. After the delivery of the first deed and the conference, Brown stated that he would give possession of the premises as soon as he

could locate elsewhere. In the meantime some of the neighbors told him that Mrs. Brown had tuberculosis.

"Well, I had closed the dicker, so that kind of upset me, and I went to Mr. Rose with it, and Mr. Rose said, well, the best thing I could do would be to bring suit and have the deal void on that."

Mr. Sullivan was told, in the meantime, that we were figuring on getting the money back, and that Mrs. Brown had tuberculosis. Sullivan replied that he had asked about it, and was told that nobody had tuberculosis. Witness visited Mr. Brown, at his place of business, where he was taking freight in at a wholesale house, and was told what witness had heard, and Brown laughed and replied, "Why, no, we haven't any disease like that," and stated that he would not mind witness calling Mrs. Brown's physician, Dr. Green, at the State Hospital. Witness returned to the cold storage plant and called Dr. Green, and was told that Mr. and Mrs. Brown were good friends of his, but that he couldn't tell a story for Mr. Brown or anybody else in a case of that kind; that Mrs. Brown had an old chronic case of tuberculosis, which she had had ever since her last child was born, about fifteen years ago. That Mrs. Brown had been very careful with herself, and that there was not much danger, but that it would be a good idea to have the house repapered. Witness replied, "No, I just figured on bringing suit to get my money back."

Either that day or the next, when witness was busy with some repair work, Sullivan came to the cold storage plant with this second deed and note, and Mr. Rose had not been told anything about this agreement relating to the time when witness had paid the contract down to $1,500. In the meantime he had seen Sullivan at the Eagles' Club, and had talked about the first transaction, for there had been no second one at the time. Mr. Rose was displeased when he learned witness had signed the agreement mentioned above. When the second deed and note were handed to him, he saw that the note didn't bear interest for four years. "Under that condition—

condition to me, I figured I could fumigate the house and repaper it and paint it inside and make it fit to live in."

This second deed and note were already prepared, and brought to the cold storage company for his signature, and Sullivan insisted very much that that deed was the very thing that witness should take. Witness stated that there was no dissatisfaction on his part, but there was with Brown. Sullivan explained that Brown wanted a note that he could take to the bank and get the money. Of course, the agreement witness signed was not bankable paper, and that was the reason Brown was dissatisfied with his first transaction. Witness signed the note at that time, and, before doing so, conferred with Mr. Rose only in a general way. Myers, the bookkeeper, in the office with Sullivan and Maynard, picked up the deed and note, and read both, and gave it to Mr. Rose, telling the latter how the note was drawn, and that witness was saving four hundred—the interest for four years. Witness went ahead and signed it as they advised. All of his dealings other than the conversation with Brown about his wife were with Sullivan, and witness did not know Mrs. Brown, Miss Brown, Biggs or Farris. After the note was signed, and the second deed accepted, witness and Sullivan went to the courthouse, where the latter paid for having the deed recorded, and witness returned to work. Several months after the transaction, in a conversation with Sullivan, witness told him that the note did not bear interest, and if it had borne interest, it would never have been signed.

Cross-examination: It was two or three months afterwards that witness told Sullivan that the note did not bear interest. Mr. Rose had a private office at the cold storage plant. Witness did not go into Mr. Rose's office to talk to him about the transaction, and was in the office with Mr. Sullivan. All three were in the same office, talking. Witness had one room repapered, and all the woodwork scrubbed and repainted with a solution recommended by Dr. Gebauer, who first suggested that all the paper be torn off, and the walls scrubbed and

repapered, but, being financially unable to do that, witness replied, "If I have to do that, I can't take it."

Dr. Gebauer stated that this renovating might make it safe, but that he wouldn't like to live in it himself. Witness took a solution of chloride of lime and hot water, and hired a man for a week, scalding the house and repainting, and repapered one room, and burned candles recommended for fumigating houses, before his family moved in. Witness would not have gone to the expense of repapering a room and painting the woodwork inside if it was in good shape. Witness did not say that Sullivan and Rose were in the same room when the matter was discussed, but said that Sullivan, Myers and himself were in Myers' office. Witness did not discuss it with Rose, but Myers walked in his office, and showed him the note and deed, and Rose replied, "Well, tell him to sign it." Nothing was said to Sullivan about the note not bearing interest there. Sullivan brought the note and deed, and did not even read it, and asked witness to sign it. At that time witness had made objections to them about the first transaction. He had told Sullivan that he was going to have the first transaction set aside. Witness had not seen any lawyer at that time about it, but had just talked to Rose and Sullivan.

Redirect examination: "Since the conversation with Sullivan, about two months after the transaction, about the note bearing interest, nothing was heard until my last payment on the $1,200 note, which was payable in monthly installments, that is, in May, 1926, when I got a letter from Mr. Newman. When the twelve hundred dollar note was paid out, about May 20, 1926, of course no more payments were made, for the $1,500 note wasn't due until January 20, and I was figuring on taking this up when it came due." That was the first time witness had heard from Brown or any of them about the note. Witness saw the note at the bank when he paid off the $1,200 note, and saw that it had the notice attached to it that it did not draw any interest.

C. E. Rose testified, in substance, that Mr. Maynard had an incurable throat trouble, and that he had advised him to be very careful against tuberculosis. Witness went out and looked at the house, and it looked like a good house for the money. He told Maynard to be sure there was not any tuberculosis around the house to get into his bad throat. So he told witness that both Sullivan and Brown said there had been no tuberculosis, and he bought the house. A few days later he told witness that things had been misrepresented, and he had learned that Mrs. Brown had had tuberculosis for twenty years. Witness advised him to bring suit for the return of his money, and witness told Sullivan that he would get a lawyer and bring suit. But witness stated that Mr. Maynard wanted the house very badly, so he went to see Mr. Brown, and reported, and Mr. Brown again told him that there had been no tuberculosis in the house. Witness said he never saw the first papers, but, when the last papers were brought to him, Mr. Myers brought them in, and he saw the note bore no interest, and Mr. Sullivan and Mr. Maynard were out in Mr. Myers' office, and he called Mr. Maynard in and told him that he would save $400 or $500, and for him to sign the note, and Maynard signed it.

M. J. Sullivan testified that he negotiated and closed the deal for the property, and that Maynard agreed to pay $3,200, $500 cash and assume a mortgage of $1,500, and the balance in notes of $30 a month, notes on or before, each note to bear its own interest. A deed was executed on these terms. Witness identified the first deed, which was introduced, and that deed, which had been recorded, recited a consideration of $3,200; $500 was acknowledged as having been paid cash and $2,700 evidenced by a note of even date, with 90 installments of $30 per month, each installment to bear interest from date at the rate of 7 per cent. per annum.

The above deed was executed, delivered to Maynard and put on record. Thereafter, the record does not show how long, Brown's daughter went to the bank, and,

because of some suggestions made to her about the notes, the Browns concluded to get Maynard to give a note for $1,500 instead of the monthly installments of $30 per month. Witness took the matter up with Maynard. His understanding was that the interest would be paid when the note became due. He took it to Maynard, and, after consultation with Mr. Rose, Mr. Maynard signed the note. About a month afterwards witness was told by Maynard that the note did not bear interest. Witness identified certified copy of the second deed, which was to the same land and for the same amount of money, being a $1,500 note bearing interest from maturity instead of the installments of $30 per month. This deed was executed, delivered and put on record.

Brown testified, in substance, that the trade was made, agreed to, and that there were 90 notes made and signed by Maynard, and that they bore interest from date. Witness had nothing to do with the handling of the second transaction; his daughter did it entirely.

Appellant contends, in the first place, that there was no mutual mistake. Our conclusion from the evidence is that there was a mutual mistake in the sense of the law, and also inequitable conduct on the part of the defendant. It is said: "Reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but, in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties." Pomeroy's Equity Jurisprudence, § 870.

We agree with learned counsel for appellant as to the nature of proof necessary to support the contention

that the proof must be clear, unequivocal and decisive. We think the proof in this case meets the rule announced by the cases referred to by appellant.

This contract was made by the parties, and about its terms there is no controversy and no conflict in the evidence. It is true Mr. Maynard says he did not sign ninety notes, but he does agree that there was to be a note given, payable in monthly installments of thirty dollars each, and that these installments were to bear interest at the rate of seven per cent. per annum from date. He received the deed to the property with this recital, and it was placed on record. He does not dispute any of the facts contained in that deed, so that was the contract or agreement made between the parties. Afterwards Brown's daughter learned they could not use the note at the bank in that form, and Sullivan went to Maynard and suggested the giving of a $1,500 note instead of the thirty dollar notes, or note with $30 installments. Nobody claims that there was anything said about the interest or about any change in the interest, so that, when that agreement was reached, both parties understood that the interest would be the same as in the original notes. Mr. Maynard's testimony shows he believed that, because no contention is made that anything was said about the interest, but he says, after he saw the note, he discovered that it did not bear interest until maturity, but that he did not tell Sullivan, and Sullivan had not read the note. According to Mr. Maynard's own testimony he discovered this mistake, knew that Sullivan did not know it, knew that Sullivan was transacting business for Brown, and he did not tell Sullivan anything about the interest until some months afterwards. Mr. Maynard went to Mr. Rose, who was Maynard's adviser, and Rose discovered that it bore interest from maturity instead of date. Sullivan and Maynard were in the adjoining office, and Rose had Maynard called in, but not Sullivan, and told Maynard he was making four or five hundred dollars in this way, and for him to sign the note. Still Sullivan knew nothing about it, and Mr. Maynard, accord-

ing to his own testimony, knew that Sullivan did not know it, because he said Sullivan had not read the note. It is contended, however, that some one told Mr. Maynard that persons had lived in the house who had tuberculosis. Mr. Maynard's own testimony on this, however, shows that he had that in mind when he made the trade, that is, long before this second transaction, and he asked both Sullivan and Brown at the time he paid the five hundred dollars, after he had consummated the deal. There was no misrepresentation. Maynard said Brown told him at the time to call Dr. Ponder, which he did. Mr. Rose testifies that he advised Maynard to bring suit to recover his five hundred dollars back, but this was all after they had discussed the tuberculosis, but he said Maynard wanted the place very badly. The whole testimony shows that Maynard intended to take it anyhow; he thought he was getting a bargain, at any rate he wanted the place under the contract he had made, so it appears that the tuberculosis had nothing to do with the failure to put in the note interest from date.

As we have already said, Mr. Maynard did not know but what it was in there until he came to sign it, and no one testifies that the subject of interest from maturity was ever mentioned. Mr. Biggs drew the note and the last deed, and Mr. Brown's daughter told him he was to pay the interest when the note became due, and Mr. Biggs took that to mean interest from maturity. Miss Brown meant from date, but not payable until the note became due.

When Sullivan went to Brown with the proposition to make the larger note for several small notes, if he had wanted to rescind the trade because he learned about the tuberculosis, he would not have said, "I am satisfied, Brown is the one who is dissatisfied," and if he had intended to have a change so as to pay interest from maturity and not from date, he would have mentioned that, but the matter was not mentioned.

We therefore conclude, according to the testimony, there was never but one agreement made with reference to interest, and that both parties agreed to this, and that

a mistake was made in writing the instrument. This being true, when Mr. Maynard discovered that the note bore interest from maturity instead of date, and knew that Mr. Sullivan did not know it, and knew he had not read the note, and after being told by Mr. Rose that he would make four or five hundred dollars by that transaction, and signed the note without ever telling Sullivan about the mistake, this was, we think, inequitable conduct, and would entitle the plaintiff to a reformation, and we think the proof was clear, unequivocal and decisive, and that the chancellor's finding was correct.

The decree is therefore affirmed.