Commonwealth *v.* Almeida, Appellant.

Argued April 11, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Arlin M. Adams*, with him *Thomas J. Minnick, Jr.*, for appellant.

*Ephraim Lipschutz*, Assistant District Attorney, with him *John H. Maurer*, District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, October 4, 1949:

This is an appeal from a judgment of guilty of murder in the first degree, with the death penalty. The crime's locale was Philadelphia; its victim, Cecil Ingling, a forty-two year old patrolman off duty. On January 30, 1947, David Almeida, Edward Hough and James Smith imbibed freely of liquor at a Philadelphia taproom, and in another taproom at 22nd and Fitzwater Streets Smith gave a .45 automatic type revolver to Hough and "a large pistol" to Almeida. Hough had a smaller pistol. Carrying out a "hold-up" plan they then went to a garage, pointed their pistols at the attendant, stole a blue car, and motored to the Acme Market, 29th

and Fairmount Avenue. There Smith said: "This looks like a good place." Almeida and Hough entered the market. The former had a handkerchief tied around the lower part of his face, and the latter wore black glasses. They entered the market with drawn guns. Hough emptied a cash register, saying: "This is a hold-up." He also took $3 from the cashier's wallet. He then robbed another cash register. Almeida, with gun in hand, approached the store manager. The latter yelled, "Hold-up," and grabbed two cans of corn, whereupon Almeida cursed him, and said: "I'll get you" and started firing. The manager was not hit. The total amount stolen was $262. Almeida also grabbed some bills from a one-armed customer.

Upon leaving the Acme Market they went to the blue car, which Smith was backing away from the curb. Patrolman Ingling was off duty at the time and when the bandits were backing their car Ingling returned to his car in which his wife, his son Leon and his daughter Jean, age 16 and 15 respectively, were sitting. The cries of "hold-up" brought three policemen and two police cars to the scene. Officer Waters and Officer Fox, in one of the police cars, came almost abreast of the blue car when Hough fired a bullet in their direction at a distance of about 30 feet. Policeman Waters then fired a shot at him.

Mrs. Ingling testified that as Hough attempted to get into the blue car her husband grabbed Hough by the back of the neck and that Smith then deliberately fired three consecutive shots at her husband, and that the first shot hit him. Her children also testified that it was Smith who fired the fatal shot.

Hough was at once apprehended. Smith and Almeida were arrested several months later for participating in a bank hold-up in New Orleans.

Hough at his trial pleaded guilty to the murder of Ingling and was sentenced to death in the electric chair. After the Almeida trial Smith was tried, con-

victed of first degree murder and sentenced to life imprisonment. In behalf of Almeida his counsel cite certain facts which they contend "raise the very strong inference that the fatal shot was fired mistakenly by a policeman." Almeida did not take the stand.

The Commonwealth contends that the jury was justified in finding that the bullet which killed Ingling was fired by one of the three confederates and further that it is immaterial whether the bullet was fired by one of them or whether it was fired by one of the policemen in repelling the assault of the bandits and in attempting to frustrate their escape.

The defendant's first assignment of error is that the court charged the jury as follows: ". . . it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling it was murder." Defendant's second assignment of error is based on the court's refusal to affirm defendant's thirteenth point for charge, which reads as follows: "If you find that the bullet which was fired and killed the deceased was not fired by any one of the three men charged with perpetrating the robbery in question, you cannot convict the defendant of murder in the first degree."

The claim is now made that "the trial judge inadequately stated the law applicable to the circumstances." This statement is unwarranted. There is no rule more firmly established in law than that which was reiterated in *Commonwealth v. Thompson*, 321 Pa. 327, 330, 184 A. 97, to wit: "The charge must be read as a whole and excerpts therefrom must be read in relation to the context. It cannot properly be separated into parts and these treated piecemeal: . . ." (citing cases). In *Harman et ux. v. Chambers*, 358 Pa. 516, 519, 57 A. 2d 842, Mr. Justice JONES speaking for this Court said: "In scrutinizing a trial court's instructions to the jury for possible error, the charge must be read and considered as a whole." In the instant case the first above quoted

statement of the trial judge was not made in the charge. Defendant's counsel in addressing the jury said: "If you find the killing was not done in the perpetration of a robbery, but, rather, where it was done in trying to prevent a robbery, and if you find, and I so ask the Court to say —if you find that neither Almeida, Smith or Hough fired those shots that killed Ingling—and I hope the Court may instruct you, . . . that it is not murder in the first degree." The trial judge said: ". . . I will rule it out, and I will charge the jury that it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling, it was still murder."

In his charge the trial judge said: "If that [fatal] shot were fired by anyone, even anyone removed from these three participants, and that shot was fired in the perpetration of a robbery, members of the jury, that is murder; that is murder in the first degree. . . . If one or more persons set in motion a chain of circumstances out of which death ensues, those persons must be held responsible for any death which by direct, by almost inevitable sequence, results from such unusual criminal act. . . . So, if the death of Officer Ingling was the inevitable consequence of the unlawful act, or acts, of the defendant, or the continuation of the unlawful act, or acts, of the defendant, acting in concert—for every one who does an unlawful act is considered by the law as the doer of all that follows—if that unlawful act be robbery, and if the result of that act is a killing, members of the jury, that killing is murder."

The defendant's thirteenth point for charge which the trial judge correctly rejected was in effect a request that the court instruct the jury that in order to convict the defendant of the death of Officer Ingling, the jury would have to find that the fatal shot was fired by one of the three robbers. Such an instruction would have been in defiance of this Court's decision in *Commonwealth v. Moyer* and *Commonwealth v. Byron*, 357

Pa. 181, 53 A. 2d 736, which decision the trial judge dutifully followed. In that decision handed down on June 30, 1947, this Court held in an opinion concurred in by the six judges [1] who heard the argument on appeal, that: "A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons. . . . when a felon's attempt to commit robbery or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. For any individual forcibly to defend himself or his family or his property from criminal aggression is a primal human instinct. It is the right and duty of both individuals and nations to meet criminal aggression with effective countermeasures. Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance. . . . If *in fact* one of the bullets fired by Earl Shank in self-defense killed Harvey Zerbe, the responsibility for that killing rests on Moyer and his co-conspirator Byron, who had armed themselves with deadly weapons for the purpose of carrying out their plan to rob Shank and whose murderous attack made Shank's firing at them in self-defense essential to the protection of himself and his employees and his property."

The assertion that "the jury should have been instructed that in order to find the defendant guilty of murder it was . . . necessary to find the killing coincidental with the perpetration of a felony," is *not the law* if by the use of the word "coincidental" it is intended to convey the idea. that the killing must have

---

[1] Justice JONES was a member of this Court at that time, but when the appeal was argued he was unavoidably absent.

taken place at practically the same moment as the robbery. This Court in *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313, held that a conviction of murder of the first degree was proper, although it appeared that, after a robbery had been completed and the conspirators were trying to effect their escape, an accomplice of the defendant shot and killed the deceased.

The *factual* issue the defendant raises in this case is identical with the factual issue raised by the defendants in *Commonwealth v. Moyer and Byron,* supra; to wit, who fired the fatal bullet—one of the robbers or a man who was lawfully resisting the criminal attack of the robbers? The *legal* question presented and decided in the *Moyer-Byron* case was precisely the legal question raised in the instant case; to wit, when men who are feloniously shot at by robbers return their fire in self-defense and a third person is killed by a shot fired by the defenders, are the robbers whose felonious action caused the shooting guilty of murder? In the *Moyer-Byron* case this Court after a thorough discussion of that question decided that under the facts of that case, "The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality." (191 of 357 Pa.) That was not dictum but authority. "Whenever a question fairly arises in the course of a trial, and there is a distinct decision thereon, the court's ruling in respect thereto can in no sense be regarded as mere 'dictum'." *New York Cent. & H. R. R. Co. v. Price,* 159 F. 330, 332, 86 C. C. A. 502, 16 L. R. A., N. S., 1103. See also *Schuetz's Estate,* 315 Pa. 105, 172 A. 865. Our decision in *Commonwealth v. Moyer and Byron,* supra, is authority for our decision in this case.

Our decision in the *Moyer-Byron* case was an application of the long established principle that he whose felonious act is the *proximate* cause of another's death is *criminally* responsible for that death and must answer

to society for it exactly as he who is *negligently* the *proximate cause* of another's death is *civilly* responsible for that death and must answer in damages for it. Wharton on Homicide, Third Edition, p. 30, says under the heading of "Causal Connections" that: ". . . one whose wrongful act hastens or accelerates the death of another, or contributes to its cause, is guilty of homicide, though other causes co-operate. And he is guilty *if his act was the cause of the cause of death; if the relation was causal*, and the injured condition was not merely the occasion upon which another cause intervened not produced by the first injury, or related to it in any other than a casual way, then the person inflicting the injury is guilty of homicide." Professor Joseph H. Beale of Harvard Law School in an article entitled "The Proximate Consequences of an Act," 33 Harvard L. R. 633, 646, said: "Though there is an active force intervening after defendant's act, *the result will nevertheless be proximate if the defendant's act actively caused the intervening force.* In such a case the defendant's force is really continuing in active operation, *by means of the force it stimulated into activity. . . .* Defendant may by his conduct so affect a person or an animal as to stir him to action; the result of such action is chargeable to defendant. . . . Defendant by threats of violence drove his wife through the house until she jumped out of the window; he was a proximate cause of the injury thereby resulting to his wife." Citing: *Reg. v. Halliday*, 61 L. T. R. 701, 702 (1889), where Lord COLERIDGE, C. J., said: "If a man creates in another man's mind an immediate sense of danger which causes such person to try to escape, and in so doing he injures himself, the person who creates such a state of mind is responsible for the injuries which result." Professor Beale sums up the requirements of proximity of result as follows: "1. The defendant must have acted (or failed to act in violation of a duty). 2. The force

thus created must (a) have remained active itself *or created another force which remained active until it directly caused the result*; or (b) have created a new active *risk* of being acted upon by the active force that caused the result."

∙ These principles apply to *both crimes and torts.* Professor Beale in an article entitled "Recovery for Consequences of an Act," 9 Harvard L. R. 80, 84, says: "Professor Wigmore has lately suggested certain principles upon which liability for a tort is to be determined. The *same* principles determine criminal responsibility, . . . We are to show, then, in the first place, that the act may properly be called defendant's act because of this force which he set in motion; and that being done, we are to show that the defendant is to be held legally responsible for his act."

Justice HOLMES in his book on "The Common Law," (36th Ed.) pp. 56 and 57, said: Acts should be judged by *their tendency under the known circumstances,* not by the actual intent which accompanies them. . . . "the object of the law is to prevent human life being endangered or taken. . . . the law requires [men] at their peril to know the teachings of common experience, just as it requires them to know the law. . . . the test of murder is the degree of danger to life attending the act under the known circumstances of the case."

Bishop, Vol. 2, New Criminal Law, section 424, says: "He whose act causes in any way, directly or indirectly, the death of another, kills him, within the meaning of the law of felonious homicide. It is a rule both of reason and the law that whenever one's will *contributes to impel a physical force, whether another's, his own, or a combined force, proceeding from whatever different sources, he is responsible for the result, the same as though his hand, unaided, had produced it.* The contribution, however, must be of such magnitude, and so near the result, that, sustaining to it the relation of

contributory cause to effect, the law takes it within its cognizance." Green, in his book entitled *Rationale of Proximate Cause*, p. 132-133 (1927), says: "Causal relation is the universal factor common to all legal liability. . . . *And it is exactly the same problem wherever found and is soluble by the same process.*" (Italics supplied in this and the three preceding paragraphs.)

Courts in the United States, England and Canada have applied the foregoing principles of "proximate cause" in murder cases, as the cases now to be cited and reviewed in this opinion demonstrate.

The principle of proximate cause in *criminal* cases was applied by one of the ablest of Pennsylvania nisi prius judges 105 years ago, to wit, President Judge KING, in the case of *Commonwealth v. Hare*, 2 Pa. L. J. 467 (1844). Two *separate* bodies of men were fighting each other with firearms in a public street and as a result a citizen was killed. Judge KING held that the members of *both* bodies of men were guilty of felonious homicide. At the trial of Isaac Hare, one of the rioters, on a charge of murder, President Judge KING instructed the jury, inter alia, as follows: "If during such a scene of unlawful violence an innocent third person is slain, . . . such a homicide would be murder at common law in all the parties engaged in the affray. It would be a homicide, the consequence of an unlawful act, and all participants in such an act are alike responsible for its consequences. *If the law should be called upon to detect the particular agents by whom such a slaying has been perpetrated in a general combat of this kind, it would perpetually defeat justice and give immunity to guilt. . . . Shall the violators of the public peace, whose unlawful acts have produced the death of the unoffending, escape, because from the manner and time of the fire it is impossible to tell from what quarter the implement of death was propelled? Certainly not.* The law declares to such outlaws: you

are. *equally involved* in· *all* the *consequences* of your assault on the public peace and safety. Is there any hardship in this principle? Does not a just regard to the general safety demand its strict application? . . . Joseph Rice was killed . . . at a time when the probabilities are that both belligerents were maintaining a desultory fire upon each other, and hence it becomes difficult to say with positive accuracy by which he was killed. Are the party *at the market* to escape the consequences of his death by raising a doubt *whether a shot from their opponents* at Jefferson street, Harmony court and the Germantown road, may not have killed him?" After stating that "each and all are criminally liable for all *the consequences flowing from* such acts of unauthorized vengeance", Judge KING said: "Such we believe to be the law, founded on the plainest reason, justified by the clearest expediency, and demanded by the most obvious necessity." (Italics supplied.)

Applying the aforegoing principles to the instant case, we have a band of robbers engaged in an exchange of shots with city policemen *whose duty it is to subdue the bandits if possible.* In the course of the exchange of deadly bullets Officer Ingling is slain. The policemen cannot be charged with any wrongdoing because their participation in the exchange of bullets with the bandits was both in justifiable self-defense and *in the performance of their duty.* The felonious acts of the robbers in firing shots at the policemen, well knowing that their fire would be returned, as it should have been, was the proximate cause of Officer Ingling's death.

The doctrine of proximate cause in criminal cases was applied by the Supreme Court of Tennessee in *Letner v. State*, 299 S. W. 1049 (1927). The facts were that three youths were crossing a river in a boat at a dangerous point. When the boat was about in the middle of the river someone standing above the western bank shot into the water about six feet from the boat.

608

A second shot hit the water nearer the boat whereupon one of the youths jumped out causing the boat to capsize as a result of which the two other occupants were drowned. The man who fired the shot was indicted for murder. The defense contended that the death of the two youths was caused by the capsizing of the boat by the third occupant and that this act constituted a supervening cause. The Court held that the defendant could not avoid the consequences of his wrongful act by *relying on a supervening cause which resulted naturally and proximately from that act.* The Court said: ". . . in the instant case the wrongful act of the defendant; that is, firing at or near the boys in the boat, was the proximate cause, the producing cause, the cause that was primarily responsible for the death of deceased." The defendant was found guilty of involuntary manslaughter. The jury apparently found that there was no malice in the defendant's act. However, in order to convict him of even involuntary manslaughter the jury had to find that the *proximate cause* of the drowning of the deceased was the firing by the defendant of two shots near the boat in which the deceased was sitting when it was capsized by the action of a *third* occupant who having been frightened by defendant's shooting, jumped out of the boat in such a way as to capsize it. The "jumping out" from the boat, which act capsized it, was the natural result of the defendant's unlawful act in firing shots toward the boat, and his unlawful act was, therefore, the proximate cause of the fatality.

In *State v. Leopold*, 110 Conn. 55, 147 A. 118, 121, the defendant and another were tried for murder of two boys, children of a tenant, by willfully burning a building. Defendant employed one Weiss to set fire to the building for the purpose of collecting the insurance. Weiss was killed during the fire.

The two boys of the tenant perished in the fire. It appeared that the boys either remained in the building,

or when on the way out were sent back by their father to recover some property and became trapped. The defendant requested the court to charge that "if they [the boys] had a reasonable opportunity to escape from the burning building and would have escaped but for their own conduct or the act of their father in directing them to return, the accused could not be found guilty of causing their death." This instruction the court refused and told the jury that "the negligence of the victims of a crime did not diminish or nullify the crime and that even if they found the claim as to the conduct of these boys to be true the accused would not thereby be excused."

The Supreme Court of Connecticut said: "Every person is held to be responsible for the natural consequences of his acts, and if he commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that *other causes cooperated to produce that result.* State v. Block, 87 Conn. 573, 89 Atl. 167 [49 L. R. A. (N. S.) 913]; 13 R. C. L. 748, 751. *The act of the accused need not be the immediate cause of the death;* he is responsible, though the direct cause is an act of the deceased if such act, not being itself an independent and efficient cause, *results naturally from, and is reasonably due to,* the unlawful act of the accused. 29 Corpus Juris, 1079; State v. Badgett, 87 S. C. 543, 70 S. E. 301. If the death of these boys resulted in a *natural sequence* from the setting of the building on fire, even though their conduct contributed to or was the immediate cause of it, *the accused would be responsible;* and the effort of a person to save property of value which is liable to destruction by fire is such a natural and ordinary course of conduct that it cannot be said to break the sequence of cause and effect." (Italics supplied.) The conviction of the defendant was sustained.

In the Chicago "Anarchists' Case", *Spies et al. v. People*, 122 Ill. 1, 12 N. E. 865, 3 Am. Stat. 320, the principle of proximate cause was applied. In that case the man who hurled the death-dealing bomb at the policeman was never identified, and there was no *direct proof* that the defendants had ever acted in concert with him. There was no proof *except an inference* that the defendants had induced the man who threw the deadly bomb to do so by inflaming his mind to commit murder. However, the Supreme Court of Illinois, in affirming the judgment of guilty with the death penalty imposed on seven defendants said, quoting 1 Bish. Criminal Law, section 641 : "One is responsible for what of wrong flows directly from his corrupt intentions. . . . *If he set in motion the physical power of another, he is liable for its result.*" (Italics supplied.)

In the instant case we do not have to rely upon inferences to support the fact that Almeida and his confederates started the chain of events that resulted in the death of Officer Ingling. Their acts were "the cause of the cause" of the murder. They "set in motion the physical power" which resulted in Ingling's death and they are criminally responsible for that result. Whether the fatal bullet was fired by one of the bandits or by one of the policemen who were performing their duty in repelling the bandit's assault and defending themselves and endeavoring to prevent the escape of the felons is immaterial. Whoever fired the fatal shot, the killing of Officer Ingling had its genesis in the robbing by the defendant and his confederates of the Acme Market, and in their firing upon the police officers who in the performance of their duty were attempting to take them into custody.

Anyone who understands the facts in the case of *Johnson et al. v. State*, 142 Ala. 70, 2 L. R. A. (N.S.) 897, 38 So. 182, will comprehend that the court in that case applied the principle of proximate cause as

we do in the instant case. The case arose on an application for bail for two women charged with murder in the first degree. Bail was refused. The Supreme Court of Alabama said: ". . . The evidence establishes that [John Johnson] the father of these petitioners shot and killed a deputy sheriff [George Bryan] in resisting his arrest by that officer and others. No justification is shown for the killing. And it is reasonably certain that had these petitioners [Johnson's daughters] not interfered, the killing would not have occurred. Indeed, their father would have been overpowered by the officers without bodily harm to him, and thus been rendered impotent to have procured and used the pistol with which he inflicted the deadly wounds, *had they not by their conduct freed one of his hands from the grasp of the officer who was killed.* That *these petitioners' conduct, under the evidence, was the cause of the killing, scarcely admits of doubt.* . . . The theory seems to be that if he [the father] was insane, and therefore incapable of committing murder, the petitioners are not criminally responsible for his act of firing the pistol which produced the death of the officer. Had the trial judge permitted this proof to have been made, and had found in line with it, in view of the conduct of the petitioners on the occasion of the homicide, which was calculated to incite, and did incite the father to commit the crime, they are responsible for his act." (Italics supplied.)

The word "incite" means "to spur or urge on, as, to incite a mob to violence" (Webster's Dictionary). It ordinarily implies something *said* by the inciters. The word "incite" as used by the Alabama court was, under the facts of that case, ill chosen, because in that case the record shows that Johnson's daughters *said nothing* to their father before the fatal shooting, but one of them did cause the Deputy Sheriff, George Bryan, to unloose his hold on Johnson by striking the Deputy

Sheriff on the back of the head with a scantling. Johnson then drew a pistol and fatally shot Bryan. It is obvious that the Alabama Court held Maggie Johnson prima facie guilty of murder not because she assaulted the deputy sheriff, but because *by so striking* the deputy sheriff with the scantling *she caused him to unloose his grasp* on her father's arm and the latter was thereby *enabled* to shoot the deputy sheriff. The Court said that, "They by their conduct freed one of his [the killer's] hands" and "their conduct was the cause of the killing".

Wharton on Homicide, Third Edition, page 23, interprets this Alabama case as sustaining the following principle: ". . . one who, by interfering in aid of an innocent person,[2] whom officers are attempting to arrest, frees his hands and enables him to kill one of the officers, is guilty of murder."

In *Taylor v. State*, 55 S. W. 961 (Texas), the facts were that during an attempt to rob a train one of the robbers took Johnson, a fireman on the train, from the engine to the front of the express car. While Newman and Johnson were parleying at the express car Buchanan, a passenger on the train came out of the rear of a passenger coach and began firing. The robbers returned the fire. The fireman was shot and killed by a shot fired by the passenger. The appellant objected to the charge of the court on the ground, first, that the evidence did not show that defendant and those acting with him placed Johnson in front of the express car to get him shot, *but to prevent a shooting,* and second, because in front of the express car was not more dangererous than at any other place along the line. The Texas Court of Criminal Appeals said: "The whole question here is one of causal connection. *If the appellant here set in motion the cause which occasioned the death of deceased, we hold it to be a sound doctrine that he would*

[2] Wharton used the words "innocent person", but apparently it is an inadvertence. The words should be "insane person".

*be as culpable as if he had done the deed with his own hands."* (Italics supplied.) The Court then cited the following from 2 Bishop New Cr. Law, section 424, etc.: "He whose act causes in any way, directly or indirectly, the death of another, kills him, within the meaning of the law of felonious homicide. It is a rule both of reason and the law that whenever one's will *contributes to impel a physical force, whether another's, his own, or a combined force, proceeding from whatever different sources, he is responsible for the result, the same as though his hand, unaided, had produced it."* (Italics supplied.) The Court said further: "They [the robbers] put him [the fireman] there in order to effect the robbery, and while they required him to remain at the post assigned him, which was a place of danger, he was shot. His life was taken on account of their direct and lawless act, and they are responsible for his murder, whether it was occasioned by their own volition or by the shots of their adversaries; and their act was the proximate cause of the destruction of his life, and they cannot escape the consequences." In that case the judgment was reversed due to the erroneous admission of evidence "introduced through testimony of the District Attorney."

It was putting the fireman in a dangerous place *"to effect the robbery"* which made the killing of the fireman murder in the first degree. Putting a man in a dangerous place where he is *accidentally* killed is not murder in any degree *unless the act was done maliciously.* The Texas train robbers *did not* put the fireman in a dangerous place so that he would be killed. They could easily have killed him with their own weapons, but killing him would serve no purpose of theirs. He was worth more to them alive than dead. The *obvious inference* is that they put him in a place which proved to be a place of danger, *not* to have him killed but *to prevent firing* from the direction of the passenger cars "in order to consummate their purpose". (The words quoted

are the Texas Court's.) As their purpose was *to rob the express car, this malicious purpose made every one of their acts malicious.* When the fireman was killed (contrary to the robbers' intention) with a bullet fired by a passenger, this killing became murder in the first degree because the train robbery in itself was a malicious act and *everything that the train robbers did in effecting their felonious purpose* was criminally tainted with the malice which motivated their planning of the robbery.

In *Keaton v. State*, 57 S. W. 1125, another one of the same train robbers was convicted of murder in the first degree for killing the fireman. The Texas Court of Criminal Appeals in sustaining the conviction quoted with approval this principle from *Blain v. State*, 30 Tex. App. 702, 18 S. W. 862: "Again, if a person instigates or agrees with another to commit a crime, and the person so instigated commits a crime different from, *but one likely to be caused by or become the reasonable result of, the crime intended,* the instigator is an accessory before the fact, and, if present at its commission, is a principal thereto."

The case of *Taylor v. State*, 63 S. W. 330, was again before the Court of Criminal Appeals of Texas. In the second trial the court charged the jury as follows: "If you should find that defendant, and those, if any, acting with him in an attempt to perpetrate a robbery, did not compel said Lee Johnson to leave a place of safety, and approach, be, and remain in a place of danger, but that said Johnson voluntarily, willingly, and not under fear of violence from such parties, left a place of safety, and had voluntarily placed himself in danger, and that, in consequence of so exposing himself to danger voluntarily, received the fatal shot, and was thereby killed by those resisting the design to rob, then, if you so believe, or if you have a reasonable doubt thereof, you

will acquit defendant." As to that the appellate court said: "While this charge is not drawn, perhaps, as accurately as it should have been, yet, taken as a whole, it submits the question of Johnson voluntarily leaving a place of safety, and placing himself in danger, without fear of violence or compulsion from defendant and his co-conspirators; and under these circumstances they would not be responsible for his death. We are of opinion this sufficiently submits *this theory of the case.*" (Italics supplied.) The Court *did not say whether or not this theory was correct* from the standpoint of the Commonwealth. It said in effect that this was a "theory of the case". From what the Court had said when the case was first before it, it is a reasonable inference that the verdict of guilty would have been sustained even if Johnson had *voluntarily* left a place of safety and gone to the place where he was shot. The verdict of guilty would have been justified because the homicide was committed in the prepetration of a robbery. As the Court said in its opinion in the first case in its quotation from 2 Bishop New Cr. Law, ". . . whenever one's will contributes to impel a physical force, whether another's, his own, or a combined force . . . he is responsible for the result." [3]

In *Wilson v. State*, 68 S. W. (2d) 100, (Ark.), the defendants were charged with the murder of a bank teller. In effecting their escape after robbing a bank they forced the teller to accompany them in an attempt to shield themselves from an attack upon the part of the town marshal. The town marshal accidentally killed the teller when shooting at the robbers. It was held that the defendants were guilty of murder both at common

---

[3] Professor Beale said of these Texas cases: "Defendants were forcing this person [the trainman] to accompany them; but the court was willing to decide the case *without relying upon that additional fact.*" (Italics supplied) 33 Harvard Law Review, 649, footnote 65.

law and under the statute. The Court in its opinion stated: "They [the robbers] wished to use him [the teller] as a breastwork, as it were, or they thought perhaps the outsiders would not shoot at them for fear of killing Guthrie. In doing this they committed another crime, kidnapping, and caused Guthrie's death." The Court cited the following, inter alia, from 29 C. J. 1077: "Defendant's act or omission need not be the immediate cause of the death; he is responsible if the direct cause results naturally from his conduct."

In a case where a man while committing a robbery or attempting to escape from a place where he had just been committing a robbery uses another person as a shield to prevent firing in the robber's direction and the human shield is killed by someone lawfully firing at the robber, the malice that would make the killing murder by the robber would not arise from the fact of using another person as a shield but *from the robbery itself*, which is a crime motivated by malice. If a person *not engaged* in the commission of a malicious crime suddenly found himself being shot at and he places some person in front of him as a shield in the honest and reasonable belief that in doing so he would prevent further firing in his direction, and if at the instant of his doing so or immediately thereafter a shot was fired in his direction and the human shield was killed, the person so using the human shield would not be guilty of murder because his act was not motivated by malice and he was not engaged in the commission of a felony. Putting a person in a place of danger unless there is malice in the act is not a felony, even if that person is killed. For example, if the driver of an automobile invites someone to ride in his car and the car becomes a place of danger through the driver's negligence and the passenger is killed as a result thereof, the driver would ordinarily not be guilty of any higher offense than involuntary manslaughter.

In *People v. Manriquez*, 206 Pac. 63 (Cal.), the facts were that a homicide resulted from the attempt of the defendant and two others to rob a store. The defendant testified that as soon as he "put his gun on him [the Chinese proprietor] . . . he tried to grab it. . . . When the Chinaman grabbed at me, the pistol went off, and he went down, and I ran out . . ." Although the *immediate force* which caused the revolver to go off *was supplied by the victim in grabbing the gun,* the defendant and his accomplices were held to be guilty of murder in the first degree and their conviction was affirmed.

The claim that no English case sustains our position in this case is without foundation. The following English cases show that British courts like our own, have applied the principle of proximate cause in determining guilt in criminal cases. As the principle is expressed in 1 East, Pleas of the Crown, 257: lawless individuals "must at their peril abide the event of their actions".

In the case of *Queen v. McIntyre*, 2 Cox, C. C. 379, a husband kicked his wife, injuring her, and the physician administered brandy as a restorative, some of which entered the wife's lungs and caused her death. It was held that the husband was properly indicted for, and convicted of, her murder, where the blow rendered the application of the brandy necessary, and the *defective power of swallowing was the consequence of the blow.*

In *Reg. v. Towers*, 12 Cox's Criminal Cases 530, 533, the facts were that the defendant in assaulting a woman who had in her arms an infant so frightened it that it had convulsions and died within six weeks. It was held that it was for the jury to say whether the child's death was the direct result of the prisoner's unlawful act. Judge DENMAN said: "If he were to say, as a conclusion of law, that murder could not have been caused by such an act as this, he might have been laying down a dangerous precedent for the future; for, to commit a murder, a man might do the very thing this man had done."

In *Rex v. Hickman*, 5 Car. & P. Reports 151, the defendant made an assault upon a man riding on horseback by striking him with a stick. The victim acting from well-grounded apprehension of a further attack which would endanger his life spurred on his horse, whereby the horse became frightened and threw him off as a result of which the rider sustained a mortal wound. The defendant's conviction of manslaughter was held to be proper.

In *King v. Hodgson and Others*, 1 Leach 6, 168 Eng. Rep. 105 (1730) : "The prisoners, together with several others, were hired by one J. S. to assist him in carrying away his household furniture, in order to avoid its being distrained for rent. They accordingly assembled for this purpose, armed with bludgeons and other offensive weapons. The landlord of the house, accompanied on his part by another set of men, came to prevent the removal of the goods, and a violent affray ensued. The constable was called in, and he produced his authority, but could not induce them to disperse. While they were fighting in the street, one of the company, to the Jurors unknown, killed a boy, who was standing at his father's door looking on, but totally unconcerned in the affray." The question presented for determination was whether or not this was murder in all the company?

The majority of the judges held "that as the boy was found to be unconcerned in the affray, his having been killed by one of the company could not possibly affect the rest; for the homicide did not happen in prosecution of the illegal act (see 8 Mod. 165) ; and therefore the persons, though constructively present, could not be said to be aiding and abetting the death of one who was totally unconcerned in the design for which the parties had assembled."

On the other hand, the two Chief Justices (HOLT and POLLEXFEN) held the opinion "that it was murder in all the company, because they were all engaged in an un-

lawful act, by proceeding in the affray after the constable had interposed, and commanded them to keep the peace, especially as the manner in which they originally assembled, viz, with offensive weapons and in a riotous manner, was contrary to law, though the purpose for which they assembled, viz, to carry away the goods was justifiable(1); and cited Stamf. 17, 40; Fitz. Cor. 350; Crop. 244(2), where divers go to commit a disseisin, and one of them kill a man, the rest are principal felons."

The opinion of Chief Justices HOLT and POLLEXFEN holding criminally responsible for the boy's death all those "engaged in an unlawful act" is logical and correct. The opinion of the majority which held that because the boy was "unconcerned in the affray . . . the homicide did not happen in prosecution of the illegal act" is wholly untenable.

In *Rex v. Valade*, Crt. of King's Bench, Quebec, Appeal Side, 26 Canadian Criminal Cases 233, it was held that a man engaged in a criminal act is liable for its indirect as well as its direct consequences. The court there held that when a man took a young girl under the age of consent to a secluded apartment for an improper purpose following which she jumped from the window to the street in order to get away from him and she was killed by the fall, he was guilty of manslaughter.

The decision in *People v. Garippo et al.*, 292 Ill. 293, 127 N. E. 75, does not conflict in the slightest degree with our opinion and decision in the instant case, as anyone who analyzes the facts in the *Garippo* case will readily comprehend. No one disputes the fact that the shooting of Officer Ingling *resulted directly* from the robbery of the Acme Market and from the felons' shooting resistance to arrest by policemen immediately thereafter. In the *Garippo* case, on the other hand, there is *not* the *slightest evidence* that the firing of the bullet which caused the robber's death *was in any way* related

to any robbery. The defendant in the *Garippo* case was one of a group of five men who engaged in several holdups. They finally robbed a drunken man who came out of a restaurant. The defendant pushed the drunken man into a hallway. When several of the group were about ten feet away from where one Scalzitti and Garippo and the drunken man were, a shot was heard, followed by three or four other shots. Scalzitti, one of the robbers, was shot through the forehead and killed instantly. The Supreme Court of Illinois pointed out that there was no positive or direct testimony as to the *killing of Scalzitti.* That Court said: "no motive is shown in the evidence for any of them [the defendants] to do the shooting . . . The drunken man whom they were attempting to hold up did not testify on the trial . . ." The Court further said: "Without doubt there was a common design among these men to hold up the drunken man, *but this design had nothing whatever to do with the shooting of Scalzitti, . . . . .*" (Italics supplied.) In the *Garippo* case the bullet which killed the robber might have been fired by someone who was aiming at an alley cat or by someone who was recklessly shooting out a window. *Unlike the Almeida case* there was *no causal connection* established between the holdup and the shooting.

An attempt has been made to show that the case of *Butler et al. v. People,* 18 N. E. 338 (Ill.), is opposed to our ruling in this case. Only by ignoring the facts can the decision in that case be so interpreted. In that case no robbery or other felony was involved. The defendants became very noisy and boisterous around a tent show. The village marshal signaled them to keep quiet, but, not being heeded, he stepped up to William Butler and attempted to arrest him. The latter either pushed or struck the marshal. Then Franklin Butler came up behind the marshal and struck him two blows on the head with his fist, which knocked him down, or knocked him on his hands and knees. William Butler then laid

hold of the marshal, and the bystanders came up to stop the fight, and while they were parting the men, the marshal discharged his revolver, and John Butler, a brother of the defendants, who was standing near by, was killed.

The Supreme Court of Illinois in reversing the conviction of the defendants of manslaughter said: "Here, under the instructions of the court, the two defendants are held responsible for the shooting did by Conrey, although there was no concert of action whatever between him and them. . . . It is true, the defendants assaulted Conrey, and struck him with their fists; *but his life was not in peril, nor was he in danger of suffering great bodily harm. There was nothing, therefore, in the character of the assault which could justify a prudent man to resort to a revolver.*" (Italics supplied.) In other words the act of the village marshal in firing a bullet into the crowd was not an invited and foreseeable result of any felonious act on the part of the defendants. *They had done nothing which reasonably justified the officer's shooting into the crowd,* and, therefore, they could not be held guilty of the homicide resulting from his unwarranted act. In the instant case these bandits by their murderous shooting at the officers *made inevitable a return fire from the officers.* For the death resulting from this exchange of bullets these felons are morally *and* legally responsible.[4]

The case of *Commonwealth v. Campbell,* 89 Mass. (7 Allen) 541, has been cited in opposition to our decision in this case and in the *Moyer-Byron* decision, supra.

---

[4] In *Taylor v. State,* supra, the Texas Supreme Court of Criminal Appeal analyzed the Illinois case of *Butler v. People* exactly as we analyze it and held that the *Butler* case did not apply to the facts of the case before the Texas court. It also analyzed the case of *Commonwealth v. Campbell* as we analyze it, and the Texas court held that it also did not apply to the facts of the case then before the Texas court.

Four things are to be noted concerning the opinion in the *Campbell* case, supra. First, what has been quoted from that case, against our holding in the instant case is dicta; second, that dicta is contrary to the law of this Commonwealth as laid down by President Judge KING in *Commonwealth v. Hare*, supra; third, the decision in the *Campbell* case was condemned by Professor Joseph H. Beale, who was during his life a profound student and teacher of criminal law and a highly respected authority on criminal law; and fourth, one excerpt from the opinion in the *Campbell* case is not only opposed to the law of Pennsylvania and the law of England, but is *opposed to common sense and to the welfare of society.*

First: As to the language of the opinion in the *Campbell* case being dicta. The homicide was committed near the Armory in *Cooper* Street in Boston at about *7:00* o'clock in the evening during a riot which grew out of the enforcement of a draft of men for the army. The riotous acts done by the defendant were committed by him in *Charlestown* Street about *1:00 o'clock in the afternoon*, or about 6 hours before the commission of the homicide. The *first syllabus* of the case *correctly states* what *had* to be and what *was* decided in the case. It reads as follows: "In an indictment for murder, committed during a riot in which the prisoner was engaged, evidence is incompetent to prove other riotous acts by him at a different place and several hours earlier, unless it is first shown that the various acts were all parts of one continuous transaction." *That was all that was necessary to decide in the case,*[5] to wit, that the riotous acts done by him were at a different place and several hours before the murder and that the murder and the riotous acts were *not part* of one continuous transac-

---

[5] This Court said in *Schuetz's Estate*, 315 Pa. 105, 172 A. 865, ". . . in every case what is actually decided is the law applicable to the *particular facts*; all other legal conclusions therein are but obiter dicta". Citing cases. (Italics supplied.)

tion. From the report of the case there is no evidence whatever that there was *any* connection between the prisoner's participating in the riot at 1:00 P. M. in another part of the city and the shooting at the armory six hours later. From all that appears in the record the defendant may have gone to his home after 1:00 P. M. and completely refrained from all riotous acts. There is nothing in the report of the case that connected the defendant with the riotous acts which incited the shooting at the armory six hours later.

Second: In the *Campbell* case the Attorney General of Massachusetts cited the Philadelphia rioters case, *Com. v. Hare,* supra, in support of the Commonwealth's case. The distinction attempted in the Massachusetts opinion between the facts in the *Campbell* case and the Philadelphia rioters case is not a valid one. The fact that both parties in the Philadelphia riot had "a common object in view, namely, a breach of the peace", would not justify holding a rioter in group A responsible for a shot fired by a rioter in the hostile group B, unless the whole rioting was the *proximate. cause* of the fatal shooting. The statement in the Massachusetts opinion that the *Philadelphia* case is "obscurely and imperfectly reported" is not correct, unless it is meant that it was imperfectly quoted in the *appendix of Wharton's Law of Homicide.*

Third: Professor Beale's criticism of the decision in the *Massachusetts* case is found on page 649 of 33 Harvard Law Review. He refers to the decision as being "questionable". In a footnote he said: "The decision has unfortunately been followed." He mentions only 2 cases which followed it, to wit, *Butler v. People,* 125 Ill. 641, and *Commonwealth v. Moore,* 121 Ky. 97. In the *Butler* case the Illinois Court "followed" the *Campbell* case only to the extent of quoting its dicta. This dicta did not apply to the *Butler* case, because as the Supreme Court of Illinois in that case said: "There

was, therefore, nothing in the character of the assault [made upon the village marshal] which could justify a prudent man in resorting to a revolver." In the *Almeida* case, the *shooting* by the *officers* was justified and necessary.

The Kentucky case of *Commonwealth v. Moore* does follow the dicta in the *Campbell* case. The North Carolina case of *State v. Oxendine,* 187 N. C. 658, 122 S. E. 568 (1924), follows *Commonwealth v. Moore.* The courts of these two states *are in the minority* in refusing to apply the principle of proximate cause in criminal cases.

Fourth: In the Massachusetts opinion the following question is put: "Suppose, for example, a burglar attempts to break into a dwelling house, and the owner or occupant, while striving to resist and prevent the unlawful entrance, by misadventure kills his own servant. Can the burglar in such case be deemed guilty of criminal homicide?" The Massachusetts court answered: "Certainly not." That conclusion is without support in common sense and is inconsistent with sound public policy. Where a burglar or kidnapper breaks into a man's home with the intent to steal property therein or to kidnap a child and while so engaged opens fire upon the occupants, and the man of the house returns the fire in an attempt to defend his family, and by mischance he kills his wife or his child, or his servant, the invading felon is *morally and legally responsible for that homicide.* In Pennsylvania and in other jurisdictions such a felon would be adjudged guilty of murder in the first degree. His malicious act would be the proximate cause of the homicide. In the case of *State v. Hauptmann,* 180 A. 809, the defendant, Hauptmann, was convicted of the murder of the Lindbergh child on the theory that he had entered the nursery in an attempt to commit burglary, this intent being inferable from the stealing of the child's clothing, and while the child

was being taken down a ladder, it broke and the child was fatally injured. The New Jersey Court of Errors and Appeals said: ". . . the substantial claim throughout was that the defendant feloniously opened the window, seized the child and its clothing, and attempted to escape through the window again, and that the injuries that caused the child's death were inflicted during the perpetration of that felonious and unlawful act." There was no claim made that the child was killed *intentionally.* If, for example, there had been a watchman at the Lindbergh home and he had grappled with Hauptmann as the latter was descending the ladder, and as a result of this scuffle the ladder broke, causing the child to fall to the ground and be killed, can there be any doubt that Hauptmann would also have been adjudged guilty under those circumstances? Whether his own weight or the weight of himself *and* the watchman caused the ladder to break would have been immaterial as affecting the result. The kidnapping and the burglary were properly adjudged to be the proximate cause of the child's death.

Under neither the common law nor our statute is an *accidental killing* murder. It is not even a felony. Yet this Court has uniformly held that an accidental killing in the perpetration of or the attempt to perpetrate a robbery or burglary or any other of the enumerated felonies is murder in the first degree. The reason is that any person committing or attempting to commit, any of these major felonies is *motivated by malice* and when the killing of a human being directly results, even though *not intended,* from his malicious act, it is murder because *malice,* the essential element of murder, *is present.* The felon's malicious act in perpetrating or attempting to perpetrate, his planned major crime is justly regarded by the law as the causative antecedent of the homicide. In cases of this kind society puts its punitive hand on

the person responsible for the legally blamable cause. This doctrine is authoritatively recognized in the law.

There is no decision of this Court which has ever ruled contrary to what we are ruling on this question. In *Commonwealth v. Mellor,* 294 Pa. 339, 144 A. 534, *the question now before this Court was not then before it.* The trial judge in that case, who was the dissenting judge in the instant case in the court below, instructed the jury that if the victim was accidentally killed by a bullet from the policeman Clark's revolver he should be acquitted. All this Court said on that subject was that this defense "was submitted to the jury in a way favorable to defendant". Since the defendant was convicted and since even if he had been acquitted the Commonwealth could not have taken an appeal, the question now before us was *not* then before this Court. This court neither expressly nor by implication approved the instruction of the trial judge in that case and has never declared any such doctrine. In *Commonwealth v. Thompson,* 321 Pa. 327, 184 A. 97, the defendant was convicted of murder in the first degree and his conviction was affirmed in this Court. He complained that the trial judge did not adequately present to the jury the evidence in support of his contention that the bullet which killed Mrs. Hoopes was fired from Truitt's pistol. Truitt was a neighbor. This Court in affirming the conviction found there was no basis for complaint in the charge of the court. This Court *did not pass* upon the question which is now before us.

The following statement from 13 R. C. L., Sec. 60, p. 753, has been cited against our view : "where persons conspire together to commit robbery, and while carrying out such conspiracy their victim, in self-defense, discharges a firearm at his assailants and accidentally kills a bystander, the conspirators are not guilty of the homicide." The *only* case which R. C. L. cites in support of that statement is the case of *Com. v. Moore,* 121 Ky.

97. 13 R. C. L., sec. 60, also lays down this principle: "Whenever an independent responsible person, disconnected with the defendant, causes some intervening act to be done, the defendant is relieved of responsibility for the consequences thereof, *unless the act of intervention is the natural result of the defendant's act.* (Italics supplied.) In the instant case the act of intervention by the police officer, i. e. the shooting of the bandits, *was* the natural result of defendant's act.

It has been asserted that the case of *People v. Udwin*, 254 N. Y. 255, 172 N. E. 489, holds contrary to our opinion in this case. What the *Udwin* case stands for is shown by its six syllabi. In *none of the syllabi is there discussed the question raised in the Almeida Case.* The *point at issue* was whether or not a killing of one convict by other convicts in an attempt to escape from prison was murder in the first degree where there existed no intent to kill. Also, another question presented was whether all the convicts participating in the attempted escape were equally guilty of murder. *That case decided* that all such convicts were guilty of murder in the first degree. That there may be dictum in the *Udwin* case contrary to the view we express in the instant case is easily explained by the New York statute. The New York statutory definition of felony murder differs from the Pennsylvania statutory definition. The New York statute reads as follows: "The killing of a human being . . . is murder in the first degree, when committed: . . . *by a person* engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise. . . ." (N. Y. Penal Law §1044, italics supplied.) The phrase "by a person" does not appear in the Pennsylvania statute, and these words make a vital difference in the two statutes  See footnote 12 at the end of this opinion.

The criticism that our decision in this case is an unusual one is the same criticism which was made against

our decision in *Commonwealth v. Doris*, 287 Pa. 547
(1926). Doris with three other bandits was indicted
and convicted of first degree murder. Officer Cooper
was shot by Bentley, one of the bandits, while the latter
were seeking to escape from the scene of their crime
with the money stolen from a bank; *at that time* Doris
had actually been arrested and was in police custody.
Judge GORDON of the court below, in that case as in the
instant case, filed a dissenting opinion, and therein
declared that "there is no direct precedent in Pennsyl-
vania [6] and little outside of this jurisdiction" by which
to uphold the conviction of Doris. This Court overruled
the contention that as Doris has been seized by officers
of the law shortly after the flight began but before the
killing he could not be held responsible for it. We said :
"This overlooks the fact that he [Doris] joined in the
common design, and is responsible for the acts of each
*naturally to be expected to occur in carrying it out. . . .*
he cannot escape responsibility for an act which is the
*probable consequence* of the criminal scheme which he
has helped to devise and carry forward." (Italics sup-
plied.) Likewise, Almeida cannot escape responsibility
for what was the "probable consequence of his criminal
scheme" to commit a robbery and make his escape by
shooting at, with intent to kill, officers who were trying
to capture him.

It has been argued that our opinion in the case of
*Commonwealth v. Moyer* and *Commonwealth v. Byron*,
supra, and our opinion in the instant case are "novel."
They are no more of a "novelty" than was the opinion
of this Court in *Commonwealth v. Doris,* supra. They
are no more "novel" than was the first decision which
ever held that even an accidental killing in the perpetra-

---

[6] "It is revolting to have no better reason for a rule of law than
that so it was laid down in the time of Henry IV.": Holmes, "The
Path of the Law," 10 Harv. L. R. 457, 469.

tion or attempted perpetration of robbery or burglary is murder in the first degree. That is now the law of this Commonwealth: *Commonwealth v. Lessner*, 274 Pa. 108, 118 A. 24; *Commonwealth v. Kelly*, 333 Pa. 280, and 337 Pa. 171, 10 A. 2d 431. They are not as novel as was the first decision at common law that if one shoots at "A" and misses him and kills "B," this is murder, because of the previous felonious intent, which the law transfers from one to the other. (Blackstone, Book IV, page 1599, section 201.)

What Justice CARDOZO said is applicable here: "when they [judges] are called upon to say how far existing rules are to be extended or restricted, they must let the welfare of society fix the path, its direction and its distance. . . . The final cause of law is the welfare of society. . . . Justice and general utility, such will be the two objectives that will direct our course." [7] Justice HOLMES said: "I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage." [8]

There can be no doubt about the "justice" of holding that felon guilty of murder in the first degree who engages in a robbery or burglary and thereby inevitably calls into action defensive forces against him, the activity of which forces result in the death of a human being. [9] Neither can there be any doubt about the "gen-

---

[7] Cardozo: "The Nature of the Judicial Process", pp. 66, 67, 73 and 75.

[8] Holmes: "The Path of the Law", 10 Harv. L. R. 457.

[9] The newspapers six months ago reported that in Vancouver, B. C., a robber entered a bank, shot and wounded two of the employees, and as he was escaping with his plunder, he grabbed a five year old child and held him before his body as a shield to prevent any firing at the robber. A nearby officer, in the performance of his duty, took careful aim and shot the robber between the eyes. The child was not harmed. If the officer had accidentally killed the child instead of killing the robber can there be any doubt that the felon's act in

eral utility" of a ruling which holds this defendant Almeida guilty of the murder of Officer Ingling, even if it had been established that the bullet which killed that officer was fired by one of the police officers who were returning the fire of Almeida and his confederates and were attempting to prevent their escape.

If Mrs. Ingling should bring an action in tort against Almeida and his confederates for causing the death of her husband there is no doubt of her ability to recover a judgment against them. Since "Causal relation is the universal factor common to all legal liability" (Green "Rationale of Proximate Cause", supra) and since, as Professor Beale pointed out (supra), "All liability is based on proximate cause" and "the same principles determine criminal responsibility [as determines civil liability]," why should not Almeida be held *criminally,* as well as civilly, responsible for Officer Ingling's death?

The following cases illustrate the principle of proximate cause in the law of torts. In *Welser et al. v. United Gas Improvement Co.,* 304 Pa. 227, 155 A. 561, the facts were that the defendant's employees were unlawfully burning naphtha, a highly inflammable material, in an uncovered bucket in a public street in the City of Philadelphia. A policeman in the performance of his duty kicked over the bucket, spilling its contents and unintentionally injuring a nearby minor. In deciding the question of legal responsibility for the damage done, we said: "the employees of the defendant company . . . should have foreseen that the burning of this smoke-emitting substance in the street would attract the attention of an officer, that this officer would attempt to extinguish the fire, and that the ordinary, natural way to do so would be to kick over the pail and attempt to

---

robbing the bank and in attempting to escape with his loot would have been adjudged the criminal proximate cause of the killing of the child?

smother the flames." We held the officer guiltless and the defendant legally responsible. We quoted the following from *Hoag v. Lake Shore & Mich. South. R. R. Co.*, 85 Pa. 293, 298: "In determining what is proximate cause, the true rule is, that the injury must be . . . such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act." We also cited *Lane v. Atlantic Works*, 111 Mass. 136, 139, where the Supreme Court of Massachusetts said: "The act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury."

In the well-known "Squib Case", *Scott v. Shepherd*, 2 William Blackstone's Rep. 892 (1773), Shepherd, the man who initially *tossed* the lighted squib which destroyed the sight of one of the eyes of one Scott was held responsible for the harmful result of his unlawful act. Shepherd had not directly thrown the lighted squib into the eye of Scott, or in his direction. But when the lighted squib reached another man he in self-defense tossed it away from him, and when it then reached a second man, he likewise in self-defense tossed it away from him. It was held that the man who first threw the lighted squib into the market place was responsible for the loss of Scott's eye because the subsequent action of both Ryal and Yates was the inevitable consequence of the defendant's initial unlawful act.

A comment on the "Squib Case" appears in an article in 9 Columbia Law Review 136, at 146, entitled *"Legal Cause at Common Law"*. The writer there says: "There was nothing extraordinary in the sequence which ended in the injury. Indeed, the acts and motives of Willis

and Ryall were such as are usual in like situations. . . . Therefore, when through the ensuing events, plaintiff was put in peril from the squib, a breach of a duty owed plaintiff by defendant was consummated. The injury, being the fruition of this peril, of course was chargeable to defendant."

In *Insurance Co. v. Boon*, 95 U. S. 117, the U. S. Supreme Court held that when in a Missouri city in 1864 an armed force of Confederates attacked the city and the commander of the United States forces of the city upon realizing that he could not successfully defend the city, set fire to the city hall in order to prevent military stores in that hall from falling into the Confederate hands and the fire spread from the city hall to neighboring properties destroying the property of one Boon who had a policy of insurance upon the goods in that property, the proximate cause of the fire which destroyed the plaintiff's property was "the rebel invasion and military or usurped power. . . . It was the causa causans which set in operation every agency that contributed to the destruction. It created the military necessity for the destruction of the military stores in the city hall, and made it the duty of the commanding officer of the Federal forces to destroy them." In the instant case the criminal activities of Almeida and his confederates "created the necessity" for the police officers to shoot at them.

In *Bloom et al. v. Franklin Life Insurance Co.*, 97 Ind. 478, the facts were that August Bloom, while in a state of intoxication committed assault and battery upon the wife of his brother Albert, and Albert in defending his wife struck his brother upon the head with the jack plane, thereby fracturing his skull and causing his death. The Court held that "The act of the *assured* in this case was the *proximate* cause of his death within the meaning of the law. A man who makes a violent assault upon a woman puts his own person in danger,

for a father, a husband, or a child *may interfere to protect the assailed woman,* and *may overcome the assailant by force. Strangers* not only may interfere to protect the person violently assaulted, but are, in strict law, *under a duty to interfere.* The natural result of such an illegal act as that of the assured, therefore, was to bring his person into danger, and as death resulted his own act was the proximate cause." (Italics supplied.)

The Restatement of the Law of Torts, Section 279, says on the subject of causation: "If the actor's conduct is intended by him to bring about bodily harm to another which the actor is not privileged to inflict, it is the legal cause of any bodily harm of the type intended by him which it is a substantal factor in bringing about." Comment c says: "the wrongful character of the intervening force is of no moment. This is so not only where the injury is brought about by an intervening negligent act of a third person (see §447), but also where it is brought about by the tortious or criminal act of a third person which itself is intended to bring about the harm which is sustained by the other."

Section 443 of the Restatement of the Law of Torts reads as follows: "An intervening act of a human being or animal which is a normal response to the stimulus of a situation created by the actor's negligent conduct, is not a superseding cause of harm to another which the actor's conduct is a substantial factor in bringing about." Comment a says: "It is enough that the act is a normal response to the stimulus of the situation created by the actor's negligence."

In the *Almeida* case the shooting *by* the policemen was "a normal response to the stimulus of the situation created by the actors'," i. e. the robbers', criminal act in shooting *at* the policemen.

Two illustrations from the Restatement of Torts are apposite here:

Illustration 2, Comment c of §445: "A incites a mob to attack a jail in order to lynch B, a prisoner therein. C, one of the wardens, in resisting the attack fires on the mob. One of the bullets goes astray and enters the kitchen window of a nearby house, causing harm to D who is cooking supper therein. C's action is not a superseding cause of D's harm." If D was *killed* why should not A be held *criminally* responsible?

Illustration 3, Comment c of §445: "A attacks B upon the street. B raises his cane to ward off A's attack. In so doing he strikes C, a fellow traveler. A's attack upon B is the legal cause of the harm sustained by C." If such is the law, and it is, why should not the actions of Almeida and his confederates be held to be the legal cause of the harm sustained by Ingling? Firing a pistol to "ward off an attack" by bandits is in law no different from raising a cane to "ward off" an attack.

A knave who feloniously and maliciously starts "a chain reaction" of acts dangerous to human life must be held responsible for the natural fatal results of such acts. This is the doctrine enunciated by the textbook writers on criminal law, and which has been applied by the courts.

When men engaged in a scheme of robbery arm themselves with loaded revolvers they show that they expect to encounter forcible opposition and that to overcome it they are prepared to kill anyone who stands in their way. If in the course of their felonious enterprise they open deadly fire upon policemen or others and if in self-defense and to vindicate the law the fire is returned and someone is killed by a bullet fired in the exchange of shots, who can challenge the conclusion that the *proximate cause* of the killing was the malicious criminal action of the felons? No *other* genesis can justly be assigned to the homicide. The felons should be adjudged guilty of murder in the perpetration of a robbery, that, is murder in the first degree. As President

Judge KING said 105 years ago in *Commonwealth v. Hare,* supra: "Such we believe to be the law, founded on the plainest reason, justified by the clearest expediency, and demanded by the most obvious necessity." That was the correct conclusion also reached by the court below in the instant case.

The third assignment of error is based upon the district attorney's peremptory challenge of juror No. 5 after twelve jurors had already been sworn. It developed that Juror No. 5 was properly objectionable to the Commonwealth because of certain facts not known when she was selected but which would have been sufficient for the trial judge in his discretion to discharge her on his own motion. After a recess the matter was discussed in chambers with the trial judge in the presence of both the district attorney and the defense counsel, and as the court below expressed it, the latter "far from objecting to the District Attorney's challenging Juror No. 5, defense counsel actually reserved the right to exercise a similar peremptory challenge despite the fact that twelve jurors had then been sworn. Thereafter Juror No. 5 was challenged in open court by the District Attorney, the reason not being stated on the record to save the juror embarrassment. The remaining jurors were then moved up and another prospective juror was called, examined and challenged for cause." At this point the defense successfully challenged juror No. 11, who had formerly been juror No. 12. The selection of the remaining members of the panel, including two alternates, was thereafter completed and the case was then opened to the jury without any objection by the defense.

As to this the court below said: "We have no hesitation in holding that the defendant actually consented to the procedure of allowing the peremptory challenge to Juror No. 5 and that he cannot now raise as error

what is quite plainly an afterthought. Furthermore, his contention concerning double jeopardy, if valid at all, had to be raised by way of special plea at the trial of which he now complains: Commonwealth ex rel. v. Richards, 274 Pa. 467."

The court held that under the Act of 1935, P. L. 127, fourteen jurors, including the two alternates, must be sworn before the trial can proceed, and the accused is not in jeopardy until "all fourteen are sworn and, until that time, anyone of the jurors previously accepted and sworn may be challenged with the reasonable discretion of the trial judge." [10] We agree with this. In the case of *Commonwealth v. Curry*, 287 Pa. 553, 135 A. 316, tried in 1923, in which the defendant was adjudged guilty of murder in the first degree, this Court held that the court may during the selection of the jury and before the *entire jury* has been selected and sworn excuse or discharge one of the jurors already accepted. In that case just before the twelfth juror was selected it was discovered that there had been a misapprehension as to the identity of Juror No. 10, who was a man with a long criminal record and who had already been sworn. The commonwealth was permitted to exercise a peremptory challenge to remove him. [11] This Court in sustaining this action quoted the following

[10] The Act of May 1, 1935, P. L. 127, authorizes "the selection of two additional jurors as alternates" in the trial of any case, civil or criminal if in the opinion of the judge the trial is likely to be protracted, "and the district attorney or counsel for the plaintiff or for the defendant, or both, shall request the selection of two additional jurors as alternates . . ." These additional jurors "shall take the same oath as the other jurors selected, and must attend, at all times upon the trial of the case, in company with the other jurors." They are to all intents and purposes "jurors" in the case until the first twelve jurors retire after the submission of the case to them.

[11] The trial court [Judge HORACE STERN] stated that had it [the peremptory challenge to Juror No. 10] not been made, it would of its own motion have withdrawn the juror in the exercise of judicial discretion, citing *Com. v. Henderson*, 242 Pa. 372, 89 A. 567.

from *Alexander v. Com.*, 105 Pa. 1, 9: "He [the defendant] was not in jeopardy at the time of making the order. The trial begins when the jury is charged with the defendant, and that is at the moment a full jury is impaneled and sworn; he is not in jeopardy before. Up to that point the Court may postpone the trial as lawfully at one stage of the proceedings as another. A man is not in peril from the verdict of a jury till the full number are qualified to hearken unto the evidence and make deliverance. Eleven jurors, or eight, can give no verdict: McFadden v. Com., 23 Pa. St. 12. The practice as to the time of administering the oath to the jurors is not uniform; in some districts each juror is separately sworn as called and unchallenged, and in others none are sworn until all are selected. In either case the tribunal is unorganized while there are less than twelve, and, until it is organized, for good cause the Court may direct the drawing of the jurors to begin anew."

In *Commonwealth v. Fitzpatrick et al.*, 121 Pa. 109, 15 A. 466, this Court held that "Jeopardy is the peril in which a defendant is put when he is regularly charged with crime before a tribunal properly organized and competent to try him."

In *Commonwealth v. Kent*, 355 Pa. 146, 49 A. 2d 388, the defendant was convicted of murder in the first degree. This Court upheld the right of the trial judge to dismiss not merely one juror but the *entire jury* when there is a reasonable necessity for so doing, saying through Mr. Justice LINN: "There are many exceptions to the general statement that a person once in jeopardy may not again be put in jeopardy for the same offense. See Com. v. Cook, 6 S. & R. 577, 579 (1822); Com. v. Barille, 270 Pa. 388, 113 A. 663; Com. v. Davis, 266 Pa. 245, 110 A. 85; Thompson v. U. S., 155 U. S. 271, . . ."
In *Thompson v. United States*, supra, 274, the United States Supreme Court said: ". . . courts of justice are

638

invested with the authority to discharge a jury from giving any verdict, whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; . . ."

A jury does not come into being until it is *completely* selected and sworn. The elimination of Juror No. 5 for a legally sufficient reason was not error.

In *Commonwealth v. Fugmann*, 330 Pa. 4, 198 A. 99, this Court said in upholding the Act of 1935 that the word "inviolate" as used in the constitutional guarantee of trial by jury "means freedom from substantial impairment. It does not import rigidity of regulation in the manner of impanelling a jury." We set forth the *essentials* of a trial by jury of a defendant in a criminal case. The defendant was deprived of none of these essentials.

The other assignments of error do not require any discussion. All of them are overruled.

The judgment is affirmed and the record is remitted to the court below so that the sentence imposed may be carried out.[12]

---

[12] Our decision in *Commonwealth v. Moyer* and *Commonwealth v. Byron,* supra, was reviewed in three legal publications. In 96 U. of Pa. L. R. (Dec., 1947), p. 280, the reviewer states that the "deterrent effect" of our decision "may prove to be very great." His assertion that "the objectives of tort and criminal law are so divergent, however, that such precedents cannot be used interchangeably without causing confusion in both fields of law, with consequent illogical and undesirable results" is at variance with the authoritative opinions expressed by Professor Beale and others, supra.

In 17 Fordham L. R. (Mar., 1948), p. 124, the reviewer says in re the *Moyer-Byron* case: "Since it appears that Pennsylvania's statutory definition of felony murder, . . . is essentially that existing today at common law, the common law principles of proximate cause should apply in the enforcement of the statute, which appears to contain nothing indicating a different legislative concept of felony

CONCURRING OPINION BY MR. JUSTICE LINN:

I am convinced by the record that appellant was not harmed by the challenged instructions to the jury and therefore concur in the order of this Court affirming the judgment.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

I would reverse the judgment and remand the case for a retrial because of fundamental error in the trial

murder." The reviewer points out that the New York statutory definition of felony murder differs from the corresponding Pennsylvania statutory definition, Section 1044 of the N. Y. Penal Law reading as follows: "The killing of a human being . . . is murder in the first degree, when committed: . . . *by a person* engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise. . . . " (Italics supplied by reviewer.) He states that in a jurisdiction such as New York in which the definition of felony murder "differs from the common law definition of the crime, it is not surprising to find the decisions departing from the common law concept of what constitutes the proximate cause of the death. . . . The difference, therefore, between the Pennsylvania and the New York decisions on what appears to be similar facts, results not from conflicting fundamental theories of causation in crimes as from the discrepancy in the statutory definitions of felony murder, . . ."

In 22 Tulane L. R. (Dec., 1947), p. 326, the reviewer says in re the *Moyer-Byron* case: ". . . it is generally agreed that to constitute murder under the [felony murder] doctrine, the homicide must be a natural and reasonble consequence of the perpetration of the felony. . . . Since the factual situation of the instant case [Moyer-Byron] falls within the broad requirements given above, it would appear that the court was justified in extending the doctrine to the case where the fatal shot was fired by the intended victim of the felons." The reviewer quotes the Louisiana statutory provision that murder results ". . . when the offender is engaged in . . . armed robbery . . . even though he has no intent to kill." (La. Criminal Code of 1942, Art. 30(2).) The reviewer then says: "Applying the rule of construction embodied in Article 3 to the instant case, which in Louisiana would arise under Article 30, it is submitted that the court should reach a result substantially the same as that of the instant case [Com. v. Moyer and Byron]."

court's charge to the jury. The case was submitted on the felony murder theory; yet, the trial judge charged in effect that, even though the fatal shot was not fired by one of the felons but by someone attempting to frustrate the robbery, all the jury would need find in order to hold the defendant guilty of murder was that he was engaged in a robbery at the time of the killing. That instruction inadequately stated the law applicable to the circumstances.

On proof of no more than the perpetration of a felony and an incidental killing, liability for murder can be visited upon the participating felons *only* where the causation of the homicide is direct, i.e., where one of the felons or one acting in furtherance of the felonious design inflicted the fatal wound.[1] The so-called shield cases do not derogate from this principle. There, the causation requirement for liability is met by instructions to the jury to determine whether the offenders placed their victim in mortal jeopardy for their felonious purpose, e.g., to absorb antagonistic fire or to dissuade antagonists from firing.[2] On the other hand, as the majority opinion points out, even though a felon or one acting in his aid does not fire the fatal bullet, his conduct may have initiated such a causative chain of events as to render him legally chargeable with having been the *causa causans* of the homicide, and indictable for murder accordingly. In such circumstances, the felony murder theory supplies the malice necessary to make the killing

[1] See *Commonwealth v. Campbell*, 89 Mass. (7 Allen) 541; *Commonwealth v. Moore*, 121 Ky. 97, 88 S. W. 1085; *State v. Oxendine*, 187 N. C. 658, 122 S. E. 568; *People v. Garippo*, 292 Ill. 293, 127 N. E. 75. Cf. *Butler v. People*, 125 Ill. 641, 18 N. E. 338; *State v. Majors*, 237 S. W. (Mo.) 486; *People v. Udwin*, 254 N. Y. 255, 172 N. E. 489; *People v. Ferlin*, 265 P. (Cal.) 230; cf. also *Commonwealth v. Mellor*, 294 Pa. 339, 342, 144 A. 534; *Commonwealth v. Thompson*, 321 Pa. 327, 330, 184 A. 97.

[2] See *Taylor v. State*, 41 Tex. Cr. R. 564, 55 S. W. 961; *Keaton v. State*, 41 Tex. Cr. R. 621, 57 S. W. 1125; *Wilson v. State*, 68 S. W. 2d (Ark.) 100.

murder while the proximate (although indirect) causation of the death is capable of fastening on the felon responsibility for the homicide. Sufficiency of the evidence to support a finding of the "chain of events" is, of course, a question of law for a court, but whether the "chain of events" existed unbroken and was the proximate cause of the homicide are questions of fact that only *a jury* can properly resolve: see *Commonwealth v. Kelly,* 333 Pa. 280, 287, 288, 4 A. 2d 805. Those important factual inquiries were not submitted in the instant case. Causation was assumed by the learned trial judge and all that was left to the jury to determine, in order to hold the defendant guilty of murder, was that he was engaged in a "holdup" at the time of the killing notwithstanding there was evidence that someone other than the felons had fired the fatal bullet.

The cognate instructions of the learned trial judge to the jury were that "It makes no difference who fired that [fatal] shot. If that shot were fired by anyone, even anyone removed from these three participants, and that shot was fired in the perpetration of a robbery, members of the jury, that is murder; that is murder in the first degree." Earlier, counsel for the defendant having told the jury, during his closing address, that he would ask the court to instruct them that, if they should find that none of the robbers had fired the fatal shot, it would not be first degree murder, the trial judge, at once and in the presence and hearing of the jury, said that he would charge the jury that ". . . it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling [the innocent victim's wife], it was still murder."

That the foregoing fully and fairly reflects the substance and intent of the trial court's instructions to the jury in pertinent relation is further confirmed by what the learned trial judge said in the opinion for the court en banc (one judge dissenting) in disposing

of the defendant's motion for a new trial. In treating therein with the defendant's contention that he could not be held guilty of murder if the jury should find that one of the resisting policemen fired the fatal bullet, the opinion for the court en banc states that "Whatever doubts may have existed on this question have been unequivocally settled by the recent decision in Commonwealth v. Moyer, 357 Pa. 181 (1947), which stands for the proposition that all who participate in a robbery, are guilty of first degree murder if someone is killed in the course of the crime even though the fatal bullet is fired by some third person 'in an attempt by him to frustrate the attempted robbery.' " I do not think that this Court's pronouncement in the *Moyer* case, supra, should be taken as justifying the broad and unrestricted ground of liability upon which the learned trial judge submitted this case to the jury. Indeed, this Court's opinion in the instant case does not warrant a finding of murder under the felony murder theory for a killing not actually committed by the felons or their accomplices *except* upon a showing and adjudication of causal connection between the perpetrators of the felony and the homicide.

The only factual issue submitted to the jury in this case was whether the defendant was engaged in a "holdup" at the time Mr. Ingling was killed. Thus, the learned trial judge's charge in this connection was as follows: "Was this a holdup? That is for you to say from all these facts. Is this a holdup? If you have any reasonable doubt about the fact that this was a holdup, you must give this defendant the benefit of it and say, not guilty, but the doubt must be reasonable. If you have no reasonable doubt about it, then your verdict should be guilty of murder in the first degree",— virtually a directed verdict of guilt in the circumstances. It is further evident from the instruction, just quoted, that the learned trial judge did not reckon with the

necessity of the *jury's* finding causation. Else, why did he instruct the jury that, unless they found that there was a "holdup", they would have to acquit the defendant? Failure to find a "holdup" would, of course, have eliminated the presence of malice and, thus, have prevented the homicide from being deemed murder. But, the causation, just the same, would be no less efficient to convict the defendant of manslaughter. See comment in the majority opinion on the jury's verdict in *Letner v. State*, 299 S. W. 1049.

The facts upon which the majority opinion relies, in adjudging that indirect causation was present as a matter of law, are, of course, in the record but, unfortunately, the issue of causation was not submitted to the jury and, therefore, cannot be taken as having been competently established as a conclusive finding. Whether the acts of Almeida and his confederates [3] *were sufficient* to constitute the proximate cause of the killing was a question of law but whether they *did constitute* the proximate cause was a question of fact for the jury. There are no undisputed facts in this case so far as the defendant is concerned. He did not take the stand to testify; and no confession or admission against interest was read into the record against him. His plea of "not guilty" put in issue every scrap of evidence adduced by the Commonwealth; and the duty of resolving those issues was upon the jury and not the court.

The jury should have been instructed that, in order to find the defendant guilty of murder, it was not only necessary for them to find the killing to have been coincidental with the perpetration of a felony in which the defendant was at the time participating but that they would also have to find that the fatal shot was fired

---

[3] Hough, one of the felons, plead guilty to the charge of murder. The serious question arising out of the Almeida trial was not present in that case: cf. *Commonwealth v. Hough*, 358 Pa. 247, 56 A. 2d 84.

by one of the felons or, if not fired by one of them, that the conduct of the defendant or his accomplices set in motion a chain of events among whose reasonably foreseeable consequences was a killing such as actually occurred. The only way that the question of the defendant's guilt can any longer be properly adjudicated upon adequate instructions to the jury is by the medium of a new trial for the granting of which there is ample precedent. See *Commonwealth v. Kelly,* supra. In the *Kelly* case, the defendant was convicted of a felony murder and was sentenced to death but the judgment of guilt was reversed and the case sent back for a new trial because the trial judge had failed to submit to the jury whether there had been any break in the chain of events and whether the homicidal act was connected with the initial maliciously motivated offense. What the present Chief Justice said (at p. 288 of 333 Pa.) in the opinion for this Court, upon sending the *Kelly* case back for retrial, is peculiarly apposite,—"When the indictment charges that a murder was committed in the perpetration or attempted perpetration of any of the enumerated felonies, *the jury* must first decide whether the homicidal act was connected with the felony or was there 'a break in the chain of events.' The court below erred in taking it upon itself to decide that basic question." (Emphasis the author's.)