(No. 13210.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOE GARIPPO *et al.* Plaintiffs in Error.

*Opinion filed April 21, 1920.*

CRIMINAL LAW—*when it is error to instruct the jury as to what conspirators are guilty of homicide.* Where the defendants are on trial for manslaughter because they, in company with the deceased, attempted a hold-up during which the deceased was shot, but the evidence does not show who fired the fatal shot, who the person was who was held up, what he did or what became of him, it is error to instruct the jury that persons who conspire to do an unlawful act are guilty of a homicide which occurs in the prosecution of the common object.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

LYNN, HALLAM & KORN, and NICHOLAS A. POPE, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, NOAH C. BAINUM, and WILLIAM C. CLAUSEN, (EDWARD E. WILSON, and WALTER T. STANTON, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Joe Garippo, John Luberti, Dominick Damico and Louis Mirabella were indicted, tried and found guilty in the criminal court of Cook county of manslaughter and their punishment fixed at imprisonment in the penitentiary for the killing of Carmen Scalzitti in the early morning of Sunday, February 9, 1919, in Chicago. This writ of error is sued out to review the sentence of the criminal court on said verdict.

Carmen Scalzitti, who had shortly before his death returned to Chicago from an army camp, was at his home,

2200 Campbell Park, Saturday afternoon, leaving there about three o'clock. The four plaintiffs in error are all young men. Dominick Damico was twenty-two years of age, a teamster by occupation but unemployed at the time of the occurrence and recently discharged from the United States army; Joe Garippo was twenty-two years old, a newsboy; Louis Mirabella was twenty-one years old, a laborer, unemployed at the time of the occurrence; John Luberti was eighteen years old, a grocery clerk. The evidence shows that about eight o'clock on Saturday evening, February 8, Garippo, Luberti and Scalzitti left the Atlas pool room, at Harrison street and Blue Island avenue, for the loop district, where they stayed until about one o'clock A. M., during which time they held up two drunken men, the last hold-up being near the post-office; that they then went to Halsted and Harrison streets and into Messenger's restaurant, reaching there a little after 2:30 o'clock A. M., where they had something to eat and divided the proceeds of their hold-ups; that there were in the restaurant at that time, Paul Appal, a teamster, Joseph Sangincho, (sometimes called Doyle,) Scalzitti, the deceased, and the four plaintiffs in error; that all of these persons apparently at times went under other names than the ones here given. The evidence was to the effect that shortly after 3:15 o'clock A. M. Scalzitti left and said he was going home, but came back, saying he had missed the car, and had some further conversation with Doyle about a ring Scalzitti had on his finger; that about that time a drunken man came into the restaurant, well dressed and appearing to have some money, and when the drunken man went out Scalzitti followed him to the corner, talked with him and told him to go down Blue Island avenue; that Scalzitti then came and tapped on the restaurant window and motioned for the plaintiffs in error to come out, which they did; that Scalzitti, Garippo and Luberti walked after the drunken man down the east side of Blue Island avenue, Mirabella and Damico follow-

ing about ten feet behind; that when the drunken man reached a coffee house about opposite Hope street he went in, and the four plaintiffs in error and Scalzitti walked on down to Polk street; that then Mirabella, Luberti and Damico crossed over to the west side of Blue Island avenue, Scalzitti and Garippo walking back north on the east side of Blue Island avenue and into a doorway north of the coffee house; that when the drunken man came out of the restaurant Garippo engaged him in conversation, and when the two got opposite the doorway where Scalzitti was, Garippo pushed the man toward the hallway and Scalzitti took hold of him to pull him into it; that while this was going on, Mirabella, Luberti and Damico ran across the avenue from the other side, and when they got to within about ten feet of the hallway where Scalzitti, the drunken man and Garippo were, they heard a shot, which was followed by three or four other shots; that Mirabella, Luberti and Damico then ran away, boarded cars and went home. The evidence tends to show that when the shooting occurred Garippo apparently also ran away and went home. During this shooting Scalzitti was shot through the forehead and killed instantly.

There is no positive or direct testimony as to who fired the shot that killed Scalzitti. Paul Appal testified on behalf of the State that he knew all the plaintiffs in error and the deceased and saw them in Messenger's restaurant a short time before the shooting; that he was still in that restaurant when the shooting occurred and heard four or five shots fired about five minutes after plaintiffs in error and the deceased left the restaurant following the drunken man but did not know who fired the shots. George Kohlkous, a witness called on behalf of the State, testified that he was at a window in his coffee house, about opposite where the shooting occurred, and saw several men moving around on the street, which aroused his suspicion, and he soon heard a shot fired; that just before this he saw a

drunken man pulled into a doorway and then several other
men gathered about the place; that he saw one of these men
run behind a large box,—a chicken box,—a few feet away
from the hallway into which the drunken man was pulled,
and fire a shot towards the hallway, and then he heard
three or four shots fired after that; that he did not recog-
nize any of the men who were gathered near the hallway;
that one of them was dressed in soldier's uniform. The
evidence tends to show that Damico was the one in uniform.
Kohlkous stated that he did not know who fired the shot
from behind the box, or who the men were in or about the
hallway at the time of the shooting, or who else did any
shooting. After he heard the shot from behind the box he
got his gun and testified that he fired a shot in the air to
attract the attention of the police. His testimony was taken
at the coroner's inquest, and it does not appear whether he
testified at such inquest about the man running behind the
box and firing the shot. The evidence shows that Mirabella
returned to Messenger's restaurant shortly after the shoot-
ing but said nothing about the shooting.

The post-mortem examination showed a revolver bul-
let wound in Scalzitti's right temple, passing from right to
left through the brain, up and a little forward and lodging
above the left eyebrow; that the bullet had apparently been
fired some distance from the body. After the shooting the
police officers came to the place and found the body of Scal-
zitti. The police sergeant testified that Mirabella told him
that he thought the shot came from the hallway where the
men were engaged in the hold-up.

None of the plaintiffs in error testified at the trial. They
had signed written statements which they had given to the
police officers and which were introduced in evidence, and
some of the testimony heretofore referred to is found in
these signed statements.

Sunday afternoon following the shooting Garippo met
Luberti at a theater. They talked over the fact that Scal-

zitti had been shot, and in their statements said they went
from the theater and framed a story which they would tell
the police if arrested. On the same afternoon Mirabella
met Luberti and Garippo and they asked him if he knew
Scalzitti had been shot, and he told them no. Garippo and
Luberti were arrested, and later Damico. Thereafter Mi-
rabella gave himself up, stating to the police that he un-
derstood they wanted him. To the police officers all the
plaintiffs in error denied knowledge of who fired the shot
that killed Scalzitti.

The foregoing constitutes substantially all the testimony
offered by the People, and none was offered on behalf of
the plaintiffs in error.

The only testimony from which any inference could be
drawn that would serve as any basis whatever that either
of the plaintiffs in error fired the shot that killed Scalzitti
is that of Kohlkous, and he did not recognize the man who
fired the shot from behind the box on Blue Island avenue.
On this record there can be no question that all the plain-
tiffs in error were at the scene of the shooting, but no
motive is shown in the evidence for any of them to do
the shooting, except the bare inference that being hold-up
men they might be ready to shoot one of their number for
any spoils he might have. There is some evidence in the
record tending to show that when Scalzitti left Messenger's
restaurant he had about $1.65 on his person that was not
found on his body after he was shot. The drunken man
whom they were attempting to hold up did not testify on
the trial, and there is nothing in the record to indicate that
anyone knew who he was or where he went after the shoot-
ing, whether he was armed or whether or not he fired any
of the shots.

Counsel for plaintiffs in error earnestly argue that on
the state of facts in this record, instructions 16 and 19
given on behalf of the People were misleading and injuri-
ous to plaintiffs in error. Instruction 19 reads:

"The court instructs the jury, as a matter of law, that if several persons conspire to do an unlawful act and death occurs in the prosecution of the common object all are alike guilty of the homicide. The act of one of them done in furtherance of the common design is in the consideration of the law the act of all, and he who being present aids, abets, assists, advises or encourages, or not being present hath advised or encouraged another to do an illegal act, is responsible for all the natural and probable consequences that may arise from its perpetration."

Without doubt there was a common design among these men to hold up the drunken man, but this design had nothing whatever to do with the shooting of Scalzitti, and from the evidence the conclusion cannot be reasonably drawn that the plaintiffs in error had a common design of shooting one of their own number, such as would have been necessary in order to charge them with the murder or manslaughter of Scalzitti. The evidence all tends to show that he was the leader, and practically the moving power, in following the drunken man to hold him up; that under his leadership all of the plaintiffs in error went to the scene of the shooting. There is not the slightest evidence in the record tending to show that they had any common design or purpose to injure or rob Scalzitti. In *Butler* v. *People*, 125 Ill. 641, this court said (p. 645) : "No person can be held responsible for a homicide unless the act was either actually or constructively committed by him, and in order to be his act it must be committed by his hand, or by someone acting in concert with him or in furtherance of a common design or purpose. Where the criminal liability arises from the act of another, it must appear that the act was done in furtherance of the common design or in prosecution of the common purpose for which the parties were assembled or combined together." In this last mentioned case it appears that several persons assaulted a village marshal upon his attempt to arrest one of them for disorderly conduct. In

defending against the assault the officer drew his revolver and aimed to shoot one of his assailants but by accident and unintentionally shot and killed a bystander who was without fault.   It was held that the persons so assaulting. the officer were not guilty of the homicide and that their conviction for manslaughter could not be sustained, the court saying further, in discussing the question (p. 646) : "They would be responsible for what they did themselves and such consequences as might naturally flow from their acts and conduct, but they never advised, encouraged or assented to the acts of Conrey, [the marshal,] nor did they combine with him to do any unlawful act, nor did they in any manner assent to anything he did, and hence they could not be responsible for his conduct towards the deceased."   Several authorities are cited in that decision which tend to uphold the reasoning of the court, among others that of *Commonwealth* v. *Campbell*, 7 Allen, 541.   The court in this last case, in discussing the principle here involved, said (p. 544) : "No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by someone acting in concert with him or in furtherance of a common object or purpose. Certainly that cannot be said to be an act of a party in any just sense or on any sound legal principle which is not only not done by him or by anyone with whom he is associated or connected in a common enterprise or in attempting to accomplish the same end but is committed by a person who is his direct and immediate adversary, and who is, at the moment when the alleged criminal act is done, actually engaged in opposing and resisting him and his confederates and abettors in the accomplishment of the unlawful object for which they are united. * * * Suppose during the progress of the riot in which it is alleged the prisoner was engaged, and while the soldiers and others in possession of the armory were in the act of repelling the attack

of the mob in the street by firing upon it with the cannon which was used on the occasion, that it had burst by reason of some secret defect and killed several of those who were in its immediate vicinity, or that a soldier while handling his musket had by accident inflicted a mortal wound on himself, it would hardly be contended that in either of these cases the whole body of rioters could be held responsible for criminal homicide by reason of the lives that were thus destroyed." In *Commonwealth* v. *Moore,* 2 L. R. A. (N. S.) 719, it was held that one was not guilty of murder for the death of a bystander who was struck by a bullet fired at the accused in self-defense by one on whom he was attempting to commit a robbery. *Butler* v. *People, supra,* was cited with approval in the opinion in this last case, and *Butler* v. *People* and *Commonwealth* v. *Campbell, supra,* were cited in a note to that case discussing the principles here involved. "Those who participate in the original unlawful combination or conspiracy are not, however, liable for the acts of one of their number who, independently and not in pursuance of the original plan, commits a crime. * * * So those who engage in a conspiracy to beat another will not be guilty of murder in a homicide committed by one of their number without the knowledge of the others and not in pursuance of the common plan, as, for instance, by the use of a deadly weapon when the use of a deadly weapon was not intended by the others." (1 McClain on Crim. Law, sec. 197, and cases cited in notes.) See to the same effect, 12 Corpus Juris, 543, and cases cited.

Under the reasoning of the above authorities, instructions 16 and 19 given on behalf of the State and complained of by counsel for plaintiffs in error must be held erroneous. Under those instructions plaintiffs in error might be held responsible for shooting done by another person when there was no concert of action between him and them. The evidence shows that Scalzitti was the man who instigated

the common design to hold up the drunken man and that they were all pursuing that design when Scalzitti was killed. The evidence does not show who killed him. On the evidence in this record it cannot be held that it is proved beyond a reasonable doubt that any one designated person or persons were guilty.

For the error in giving the above instructions the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

---

(No. 13133.—Reversed and remanded.)
JOHN A. McCORMICK, Exr. Plaintiff in Error, *vs.* HELEN McCORMICK, Defendant in Error.

*Opinion filed April 21, 1920.*