726 A.2d 795

**Mark Davon WATKINS**

v.

**STATE of Maryland.**

**No. 545, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 1, 1999.

556

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Argued before DAVIS, SALMON and SONNER, JJ.

SALMON, Judge.

Article 27, section 410, of the Maryland Annotated Code (Supp.1998), provides, in relevant part: "[A]ll murder which shall be committed in the perpetration of, or attempt to perpetrate, any ... robbery ... shall be murder in the first degree." The first question addressed in this opinion concerns this felony-murder statute and arises due to an unusual factual scenario, viz: A, B, and C conspire to rob X. During the course of the robbery, A struggles with X and shoots him; he then turns his gun on B and kills him, too. Later, A says his reason for killing B was to eliminate him as an eyewitness to the robbery. Prior to the robbery, C did not know that A would kill B, or for that matter, anyone else. Is C guilty of the felony murder of B?

Two more routine issues must also be considered:

Did the trial court err in denying the motion to suppress appellant's incriminating statements to the police?

Did the trial court err in responding to a jury note?

## I. *FACTS*

Appellant, Mark Watkins, was convicted by a jury in the Circuit Court for Prince George's County of two counts of felony murder, two counts of use of a handgun in the commission of a crime of violence, robbery with a deadly weapon, and conspiracy to commit robbery with a deadly weapon. After merging the robbery with a deadly weapon conviction into one of the felony-murder convictions, the court imposed consecutive life sentences for the murders, consecutive twenty-year sentences for the handgun violations, and a consecutive twenty-year term for the conspiracy charge.

The crimes for which appellant was convicted occurred on January 5, 1997. John Whittington and Derrick Hilliard were

murdered that morning in Room 160 of a Motel 6 in Camp Springs, Maryland. Approximately five-and-a-half months later, at 4 p.m. on June 23, 1997, appellant was arrested pursuant to an arrest warrant for the murder of Whittington and Hilliard. The arrest was made outside appellant's home in Washington, D.C. Appellant was taken forthwith to a District of Columbia police station.

## A. The Suppression Hearing

Appellant moved to suppress the statements he gave to the police in the nineteen-hour period immediately following his arrest. A hearing on the suppression motion was held, with the Honorable G.R. Hovey Johnson presiding.

The four detectives who questioned appellant at the District of Columbia police station were John McCann, Ismail Canales, Norman Miller, and Richard Fulginiti, all of whom were members of the Prince George's County Police Department. They questioned appellant between 6:30 p.m. on June 23, 1997, and 11:10 a.m. the next day. During this sixteen-hour and forty-minute period, appellant was allowed to sleep in a chair for two hours between 7 and 9 a.m. on June 24th, and there were two bathroom breaks. One of the breaks was for twenty minutes commencing at 11:20 p.m. on June 23rd, and the second was for seven minutes starting at 5:40 a.m. on the 24th. He was also left alone between 4 a.m. and 4:12 a.m. and between 5:55 and 6:07 a.m. on the 24th.

The questioning of appellant was quite fruitful. He gave the police three written statements and several oral ones concerning the murders of Whittington and Hilliard.

### 1. The First Written Statement

When he was initially questioned, appellant was fully advised of his *Miranda*[1] rights by Detective McCann. Appellant waived his rights and gave the detective some background information about Whittington and Hilliard. He initially de-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

nied, however, knowing who murdered the two men. By 10:30 p.m. on June 23 rd, appellant had changed his story and had completed his first written statement. That statement read in pertinent part as follows:

[Eric Jenkins] told me that he was going to rob [Whittington] for the money. And when he robbed [Whittington and Hilliard] he showed me the rings and the watch. [Jenkins] told me that he killed them. He told me that him [sic] and [Whittington] got in a struggle and he didn't want to leave no [sic] witnesses to the murder, um, I mean to the robbery . . .

Q. When did [Jenkins] tell you he was going to rob [Whittington] and [Hilliard]?

A. One day before they got killed.

### 2. The Oral Statement to Detective Miller

At 12:35 a.m., Detective Canales was replaced by Detective Miller. Miller questioned appellant from 12:35 a.m. until 1:35 a.m. Appellant told Detective Miller, *inter alia*, that Jenkins had committed the murders, that Jenkins said he killed Hilliard so as not to leave any witnesses, and that Jenkins asked appellant to be a lookout, but appellant refused.

### 3. The Second Written Statement

Detectives Canales and Miller questioned appellant between 1:35 and 3:30 a.m. on the 24 th, at which time appellant gave a second written statement. One major change in the second story was that appellant said that Hilliard was an accomplice to the robbery of Whittington. In appellant's original statements, Hilliard was said to be merely a witness.

According to the second written statement, Hilliard told Jenkins that Whittington carried a lot of money. After hearing this, appellant, Jenkins, and Hilliard plotted to rob Whittington. The plan was that Jenkins and Hilliard were to take Whittington's money and leave together. Appellant said that Jenkins drove to the motel accompanied by Whittington and Hilliard. During the robbery, and while in a motel room,

Jenkins struggled with Whittington and then shot him, using a handgun that fired both 9 mm. and 38 caliber bullets. Jenkins then shot Hilliard. After taking Whittington's watch and rings, Jenkins left the motel in Whittington's car. Appellant was not at the motel when the shooting occurred but was waiting down the street at a 7–Eleven—close enough to the motel to hear gunshots. Appellant admitted that he waited at the 7–Eleven as a look-out for Jenkins and Hilliard. After the murder, Jenkins showed appellant the watch and rings he had stolen from Whittington. Appellant said that he saw Jenkins hide them at the home of a girl named Lisa. This statement was completed at 4 a.m.

### 4. The Third Written Statement

Appellant made a third written statement at 10:24 a.m. on the 24th. The third written statement differed from the second in that appellant admitted that he was not outside the 7–Eleven store but was outside the motel room as a lookout at the time of the shooting. Appellant heard Jenkins say, "Give me the money now." Afterwards, appellant heard two shots, and about fifteen seconds later, Jenkins came out of the motel room with a gun in his hand. Jenkins then drove away in Whittington's car.

### 5. Circumstances Surrounding the Custodial Interrogation of Appellant

Appellant had an eleventh-grade education and by June 23, 1997, had been arrested on four prior occasions. It was not established, however, whether appellant had been questioned by the police as a result of any of his previous arrests.

All of the detectives who interviewed appellant on June 23 and 24, 1997, testified at the hearing. They were unanimous in their opinion that appellant appeared to have made his statements voluntarily. Detective McCann emphasized that appellant was never denied anything during the period he was interrogated; moreover, he never asked to be left alone or said that he needed sleep. If appellant had asked to be left alone or to be allowed to sleep, his request would have been

granted, according to Detective McCann. Detective Canales testified that appellant never complained that he was sleepy nor did he appear to be tired until approximately 7 a.m.—at that point, Detective Canales felt that it was necessary that Watkins should get some rest, and Watkins was allowed to sleep for two hours.

### 6. The Rejection of Appellant's Motion to Suppress

Appellant elected not to testify or to call any witnesses at the suppression hearing. Nevertheless, at the conclusion of the hearing, defense counsel argued that, given the duration of the interrogation and the fact that appellant was deprived of sleep and interrogated throughout the night by a team of rotating officers, his statements were involuntary and should be suppressed. Judge Johnson rejected this contention, stating:

> Ms. Sullivan [defense counsel], I didn't see a thing wrong. It took a long time, but [appellant] he got whatever he asked for. If he was hungry, you know, he could have asked for more food. He didn't.... According to the testimony I heard, whenever he did request anything, he got it.

> So, time alone, I don't think, would cause it to be involuntary. And I don't think that ... there are cases that [hold that] you cannot get a team. And team number one goes in and questions him for three or four hours. And then team number one goes and gets some sleep while team number two is doing this. And then team number two goes and gets some sleep while team number three goes in. And he never is allowed to sleep.

> I don't think that is really what happened here.

> And he never, ever once said: I'm tired. I need to get some sleep. At least that didn't come out during the hearing.

> So he was not forcibly denied anything, so I'm not suppressing that.

Additional facts will be added in order to answer the questions presented.

## II. ANALYSIS

### A. The Felony–Murder Issue

In his second and third written statements to the police, appellant said that he and Hilliard were part of the group that conspired to rob Whittington. There was no evidence that appellant ever intended that anyone should be killed in the robbery. Appellant nevertheless admits that under the felony-murder rule his lack of intent makes no difference in regard to the killing of Whittington. He claims, however, that his lack of intent does make a difference as to his responsibility for the death of Hilliard—an alleged co-felon.

Appellant stresses that as to Hilliard the agreed-upon plan was that Jenkins and Hilliard were to rob Whittington of his money and then leave together. Yet Jenkins did not act according to the plan and killed Hilliard.

During a bench conference concerning jury instructions, defense counsel requested, with regard to the count charging felony murder of Hilliard, a *"Mumford*-type [*Mumford v. State*, 19 Md.App. 640, 313 A.2d 563 (1974),] instruction" regarding "foreseeability." Judge Johnson refused to give the requested instruction and prohibited counsel from arguing it to the jury. The court instructed the jury in relevant part as follows:

First degree felony murder. And, [f]olks, there are two counts of that. First degree felony murder with respect to John Whittington and first degree felony murder with respect to Derrick Hilliard and they are questions three and five [on the verdict sheet].

Question five. Is the defendant guilty or not guilty of first degree felony murder? Then I have in parenthesis, that is, did the defendant or an accomplice commit robbery with a deadly or dangerous weapon. Then again I tell you to see question two because you have already answered that. And, if so, did the defendant or an accomplice shoot

and kill Derrick Hilliard incidental or during the course of the robbery? Close parenthesis. Your verdict will either be guilty or not guilty using a standard of beyond a reasonable doubt, and your verdict must be unanimous.

Although appellant did not spell out the instruction he desired, he apparently wanted the instruction (with suitable modification) that the defendant asked for (and the trial judge rejected) in *Mumford*. As modified, the instruction would have been:

If you find that Watkins could not have anticipated that Jenkins would kill Hilliard, then you must acquit Watkins of the murder of Hilliard.[2]

In his brief, appellant asserts that if the jury believed his later statements to the police (as opposed to his first written statement) then Hilliard was a co-felon and Jenkins's actions were not foreseeable. He posits that the actions were unforeseeable inasmuch as Jenkins was not acting within the common design of the three conspirators when he killed Hilliard because "[i]t cannot be seriously contended that the co-felons had a common design of killing one of their own numbers." At this point, it is useful to note that if appellant's argument were to prevail, the felony-murder doctrine could never be used to convict a surviving felon when one co-felon kills another while a felony is in progress.

Whether a surviving co-felon can be convicted of felony murder when a cohort is killed by another co-felon is an issue of first impression in Maryland.[3] The State maintains that a surviving co-felon may be convicted for the death of a co-felon;

---

2. The instruction rejected in *Mumford* read as follows:
 [I]f you find that the [d]efendant could not have expected her companions to commit a rape, and that the victim died as a result of a rape, then you must find the [d]efendant not guilty [of murder]. *Id.* at 641, 313 A.2d 563 (some alterations in original)

3. A useful guide to the treatment of this issue by other authorities can be found in an annotation authored by Martin J. McMahon entitled, Annotation, *Application of Felony–Murder Doctrine Where Person Killed Was Co-Felon*, 89 A.L.R. 4th 783 (1991).

it also asserts that the facts in *Mumford* are a far cry from those in the case at hand and that the *Mumford* rule applies only "when the defendants are engaged in a felony and one of the defendants decides to perpetrate an unrelated felony, resulting in death." Here, the three conspirators agreed to engage in only one felony, but it resulted in two deaths. According to the State, if appellant "was an accomplice [to the robbery] his guilt [for the death of the cohort] was equal to that of the principal," regardless of whether he knew that the principal intended to kill the cohort. Under the facts of this case, we agree with the State.

### 1. The *Cabaltero* Case

One of the cases most factually apposite is *People v. Cabaltero*, 31 Cal.App.2d 52, 87 P.2d 364 (Cal.Dist.Ct.App.1939). Cabaltero, Ancheta, Dasalla, and four others conspired to rob a farmhouse. *See id.* 87 P.2d at 366. During the robbery, Cabaltero waited in the getaway car; Ancheta and a cohort stood guard at the entrance to the farmhouse, and Dasalla and three others entered the farmhouse to commit the robbery. *See id.* While the robbery was taking place, a car unexpectedly drove up to the farmhouse. *See id.* Ancheta told the two occupants of the car to remain inside the vehicle, but they did not heed his command. *See id.* The two exited the car and ran. *See id.* While the two were fleeing, Ancheta fired two shots at them. *See id.* As soon as the shots were fired, Dasalla came out of the farmhouse and shouted to Ancheta, "Damn you, what did you shoot for?" *Id.* Dasalla then shot Ancheta. *See id.* Dasalla and two others picked up Ancheta, took him to the getaway car, and drove off. *See id.* Ancheta died from his gunshot wound two weeks later. *See id.* Cabaltero was charged with and convicted of the first degree felony murder of Ancheta. *See id.* 87 P.2d at 365.

On appeal, Cabaltero argued that because Dasalla intentionally shot Ancheta, Dasalla alone was responsible for his death, and "each of the coconspirators other than [Dasalla] should be acquitted, despite the fact that the shooting occurred while all

were participating in the robbery." *Id.* 87 P.2d at 368. The court rejected this claim.

The *Cabaltero* court essentially classified all killings that occur while the felony is taking place as killings "in furtherance of" the underlying felony. The Court made no analysis of whether Ancheta's shooting actually furthered the goals and purposes of the robbery—it simply asked the question: Did Ancheta's shooting occur at the same time and place as the robbery? Because the answer to this question was clearly yes, the *Cabaltero* court had little difficulty concluding that the shooting was "in furtherance of" the robbery and that all of Dasalla's accomplices were guilty of felony murder. As will be seen, we rejected this time and place test in *Mumford. See* 19 Md.App. at 643–44, 313 A.2d 563.

### 2. *Mumford v. State*

In *Mumford,* the defendant and her four male cohorts burglarized a farmhouse. *See id.* at 641–42, 313 A.2d 563. Ms. Mumford was inside the house looking for items to steal when two of her male accomplices went out to a nearby garage/barn, presumably to look for additional loot. *See id.* at 642, 313 A.2d 563. While these two accomplices were inside the garage/barn, the woman who owned the farmhouse drove into the garage/barn, whereupon the two accomplices raped and fatally strangled her. *See id.*

At trial, Ms. Mumford admitted to participation in the burglary but denied that she ever entered the garage/barn or that she had any knowledge that her companions intended to rape or kill. *See id.* At the conclusion of trial, defense counsel requested the instructions quoted, *supra.* The trial judge refused to give the requested instructions, and the defendant was convicted of felony murder.

We reversed Mumford's conviction and said:

Each person engaged in the commission of the criminal act bears legal responsibility for all consequences which naturally and necessarily flow from the act of each and every participant. *Veney v. State,* 251 Md. 159, 174, 246 A.2d 608

(1968). . . . Consequently, a killing, even if unintentional, by one, in furtherance of or pursuant to the common object for which they combine, extends criminal liability for murder in the first degree to each and every accomplice. The application of this doctrine, however, is circumscribed by "causation" requirements which must be satisfied before the felony-murder rule may be applied:

> There is no criminal liability on the part of the others when the homicide was a fresh and independent product of the mind of one of the confederates, outside of, or foreign to, the common design. 1 Wharton, *Criminal Law and Procedure,* § 252, at 547 (Anderson ed.1957).

In sum, there must be direct causal connection between the homicide and the felony. Something more than mere coincidence in time and place between the two must be shown; otherwise, the felony-murder rule will not be applicable.

*Mumford,* 19 Md.App. at 643–44, 313 A.2d 563; *see also Jackson v. State,* 286 Md. 430, 443–44, 408 A.2d 711 (1979) (stating that *Mumford* accurately states the law regarding the connection required between the homicide and the underlying felony). The *Mumford* Court went on to hold that if the trial judge had given the requested instruction;

> the jury could have chosen not to believe that the death occurred pursuant to the burglary, but rather from rape, fresh and independent of the common design. This factual issue should have been presented to the jury, in accordance with appellant's exception. "The question of what is or is not a natural probable consequence is a question of fact for the trier of facts." *Jeter v. State,* [9 Md.App. 575, 580, 267 A.2d 319 (1970)].

*Mumford,* 19 Md.App. at 644, 313 A.2d 563.

### 3. *Campbell v. State*

The case of *Campbell v. State,* 293 Md. 438, 444 A.2d 1034 (1982), although not factually on point, does give some useful guidance as to how the felony-murder rule should be applied in the case at hand.

In *Campbell,* the Court held that criminal liability under the felony-murder doctrine ordinarily does not extend to the lethal acts of non-felons. *See id.* at 452, 444 A.2d 1034. An exception to this rule is the so-called "shield" situation in which a felon uses a hostage as a shield or otherwise puts the victim in a place of mortal danger. *See id.* at 451 n. 3, 444 A.2d 1034. Thus, when a co-felon is killed by pursuing police officers or a resisting victim, the surviving co-felons cannot be convicted of felony murder for the death of their accomplice. *See id.* at 442–52, 444 A.2d 1034.

The *Campbell* Court adopted an "agency" theory of felony murder. *See id.* at 443, 444 A.2d 1034. Under this approach, each participant in the felony is viewed as an agent for the others, making each felon liable for all acts committed by his/her accomplices "for the furtherance or in prosecution of the common object and design for which they combined together." *Id.* at 444, 444 A.2d 1034 (quoting *Commonwealth v. Campbell,* 89 Mass. 541, 544 (1863)).

The *Campbell* Court also quoted with approval from *People v. Wood,* 8 N.Y.2d 48, 201 N.Y.S.2d 328, 167 N.E.2d 736, 738 (1960):

"Thus, a felony murder embraces not any killing incidentally coincident with the felony but only those committed by one of the criminals in the attempted execution of the unlawful end. Although the homicide itself need not be within the common design, the *act* which results in death must be in furtherance of the unlawful purpose."

*Campbell,* 293 Md. at 447, 444 A.2d 1034 (emphasis in original).

The *Campbell* Court held:

[O]rdinarily, under the felony-murder doctrine, criminal culpability shall continue to be imposed for *all* lethal acts committed by a felon or an accomplice acting in furtherance of a common design. However, criminal culpability ordinarily shall not be imposed for lethal acts of nonfelons that are not committed in furtherance of a common design.

*Id.* at 451–52, 444 A.2d 1034 (emphasis added) (footnote omitted).

### 4. Other Authorities

Appellant relies on an excerpt from a treatise by Professors Wayne R. LaFave & Austin W. Scott, Jr., entitled *Substantive Criminal Law*, in which the professors use a hypothetical example where A, B, and C agree to rob X:

> What if B, angry perhaps at C's inept manner of assisting in the robbery of X, should intentionally shoot C; B would be liable for C's murder, of course, of the intent-to-kill type; but would A be liable for intent-to-kill murder or felony murder? B's intentional shooting of C is so far removed from the common plan as not to make A responsible for B's intent-to-kill murder; and *B's act should not be considered a felony murder by A because B's conduct had nothing to do with furthering the robbery, the only connection between the robbery and the shooting being a mere coincidence of time and place.*

2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.5(c), at 212 (1986) (footnote omitted) (emphasis added). In support of the last-quoted statement, LaFave & Scott rely on the famous eighteenth-century case of *Rex v. Plummer*, 84 Eng. Rep. 1103 (K.B.1700).[4]

In *Plummer*, Harding and seven others conspired to smuggle wool from England to France (which under the law of the

---

**4.** LaFave & Scott also rely on the case of *Commonwealth v. Waters*, 491 Pa. 85, 418 A.2d 312 (1980), as support for their conclusion. In *Waters*, the Supreme Court of Pennsylvania held that in order to convict an accomplice of felony murder based on the act of a co-felon, the State must show that the killing was in furtherance of the underlying felony. *See id.* 418 A.2d at 317. The court concluded that the mere fact that the killing occurred during the perpetration of the underlying felony did not alone establish that the killing was in furtherance of the felony. *See id.* 418 A.2d at 317–18. In explaining the rationale for this rule, the court stated:

> Were it otherwise, an accomplice to a robbery would be guilty of felony-murder if one of his cofelons during the course of the robbery looked out a window, saw a passerby down the street, and shot and killed him even though the passerby had no connection to the robbery whatsoever. Obviously, even though an accomplice knows or should know those connected to a robbery may be killed during the course of

time was a felony). *See id.* at 1104. The conspirators were in the process of moving the wool when they were met by agents of the king. *See id.* Once the gang learned that they had walked into a trap, one of the members of the group intentionally killed Harding. The reason for the killing was not clearly established, but Chief Justice Holt implied that a member of the gang killed Harding because he believed that Harding had informed the police of the scheme. *See id.* at 1104–05. Even though it was clear that Plummer did not kill Harding, Plummer nevertheless was tried for Harding's murder.

The court held that Plummer could not be guilty of Harding's murder. *See id.* at 1104. It conceded that if the facts had shown that one of Plummer's co-conspirators had fired the shot at one of the king's officers and accidentally killed Harding, then Plummer would be guilty of felony murder because Harding's murder would have been done pursuant to the common design to transport wool and resist arrest. *See id.; see also* Norval Morris, *The Felon's Responsibility for the Lethal Acts of Others,* 105 U. Pa. L.Rev. 50, 70 (1956) (hereinafter Morris). According to the court, although normally accomplices to a felony are liable for all murders committed by their co-felons, Plummer was not guilty under the unusual circumstances of that case. *See Plummer,* 84 Eng. Rep. at 1105. In support of this holding, Chief Justice Holt stated:

> [F]or though they are all engaged upon an unlawful act, and while they were actually in it, this murder is committed by one of the company so engaged, yet it does not appear to be done in prosecution of that unlawful act, . . . and those who are in the unlawful act, not knowing of the design that killed the other his companion cannot be guilty of it.

*Id.*

In Morris, the author concludes that the *Plummer* decision correctly applied vicarious liability principles. He states:

---

a dangerous felony, he should not be held accountable for that which he cannot *at least foresee.*
*Id.* 418 A.2d at 317 n. 10 (citation omitted).

*Plummer* is sound by more modern analysis. The killing occurred only temporally "in the course of" the crime, it was not "in furtherance of" it, and "in the course of" requires some purposive relationship between the lethal act and the crime in so far as accomplices are to be held liable for the death; the shot was not fired pursuant to the common purpose to resist arrest—if it were found as a fact that it had been fired for this purpose and had chanced to kill Harding, then it would be murder in all, but it was not so found; the killing of Harding was not within the risk of the common criminal design. . . .

Morris at 71.

Neither the hypothetical used by LaFave or *Rex v. Plummer*, upon which the hypothetical is based, support appellant's position that Hilliard's killing did not come within the ambit of the felony-murder rule. Here, it simply cannot be said that the killing of Hilliard "had nothing to do with furthering the robbery" in light of Jenkins's self-proclaimed motive to eliminate Hilliard as a robbery witness.

Appellant also places reliance on the case of *People v. Garippo*, 292 Ill. 293, 127 N.E. 75 (1920). In *Garippo*, Scalzitti and four other men conspired to mug a drunken man. *See id.* 127 N.E. at 76. While the mugging was taking place, Scalzitti was shot and killed. *See id.* The evidence did not show who fired the fatal shot or why. *See id.* 127 N.E. at 77. None of the accomplices testified, and it was not established whether any of the them were armed or whether any of them fired the fatal shot. *See id.* Scalzitti's four accomplices nevertheless were convicted of manslaughter. *See id.* 127 N.E. at 75. On appeal, the Supreme Court of Illinois reversed the convictions, saying:

Without a doubt there was a common design among these men to hold up the drunken man, but this design had nothing whatever to do with the shooting of Scalzitti, and *from the evidence the conclusion cannot be reasonably drawn that the [appellants] had a common design of shooting one of their own number*, such as would have been

necessary in order to charge them with the murder or manslaughter of Scalzitti. The evidence all tends to show that he was the leader, and practically the moving power, in following the drunken man to hold him up; that under his leadership all of the plaintiffs in error went to the scene of the shooting. There is not the slightest evidence in the record tending to show that they had any common design or purpose to injure or rob Scalzitti.

*Id.* 127 N.E. at 77 (emphasis added). In reaching its decision, the *Garippo* court considered, *inter alia*, the possibility that one of the accomplices may have killed Scalzitti in order to increase his share of the spoils but dismissed this as a "bare inference" having no evidentiary support in the record. *See id.* In the final analysis, the court concluded that no motive was shown for any of the four felons to shoot the co-felon. *See id.*

*Garippo* is distinguishable from the case *sub judice*, however, because here we know who killed the co-felon and why. Under Maryland's agency theory, each co-felon is criminally liable for the acts of a co-felon so long as the co-felon acts in furtherance of the robbery. If it is not shown why a co-felon murdered a co-felon, it follows that it cannot be said that the act was done "in furtherance of the felony."

In *People v. Ferlin,* 203 Cal. 587, 265 P. 230 (1928), Ferlin and Skala were attempting to commit arson when Skala was accidentally burned to death. *See id.* 265 P. at 232–35. Ferlin was convicted of the murder of Skala under a felony-murder theory. *See id.* 265 P. at 231. The court, citing *Garippo,* held that Ferlin could not be convicted of felony murder for the accidental death of his accomplice. *See id.* 265 P. at 235. The court stated:

It cannot be said from the record in the instant case that defendant and deceased had a common design that deceased should accidentally kill himself. Such an event was not in furtherance of the conspiracy, but entirely opposed to it.

*Id.* Under Maryland's agency theory, the result would be the same as in Ferlin, because the accidental immolation of a co-felon was incidental to and not in furtherance of the felony.

### 5. Resolution of Issue

Contrary to appellant's contention, under some circumstances the felony-murder doctrine does apply when one felon kills a co-felon while committing one of the felonies mentioned in article 27, section 410 of the Maryland Annotated Code (Supp.1998). But in order for the doctrine to apply, the State must prove more of a connection between the felony and the murder than a mere coincidence in time and place. The State must prove that the act of murder was in furtherance of the common object and design for which those that participate in the felony combined together. *See Campbell*, 293 Md. at 444, 447, 444 A.2d 1034. The killing of the co-felon need not be contemplated beforehand by those who conspire to commit the felony, but the *act* that results in the death of the co-felon must be done with the purpose of furthering the goals of the felony. *See id.; Wood*, 201 N.Y.S.2d 328, 167 N.E.2d at 738.

All persons who participate in robberies have at least two common purposes: (1) to unlawfully acquire money or property from the victim; and (2) to avoid apprehension by the police. One way to lower the chance of apprehension is to eliminate witnesses to the crime. After all, "dead men tell no tales." According to one version of events, the reason Jenkins killed Hilliard was to eliminate a witness to the robbery. Thus, Jenkins was fulfilling the unlawful goals of the felony when he killed Hilliard, and appellant is criminally liable for the killing of Hilliard under an agency theory even though he never intended that Jenkins kill anyone.

The *Mumford*-type instruction proposed by appellant would have misled the jury. If the court had given the instruction that appellant wanted, the jury would have been told that it must acquit appellant of first-degree murder if it found that appellant did not anticipate that Jenkins would kill Hilliard. Under Maryland's agency theory, it is irrelevant whether appellant could have anticipated that Jenkins would kill a co-felon—the test is whether the *act* of shooting Hilliard was done in furtherance of the unlawful purpose (the robbery). *See Campbell*, 293 Md. at 447, 444 A.2d 1034. There was no

dispute as to why Hilliard was shot. Given the undisputed facts, the jury could not have found that the killing of Hilliard was "outside of, or foreign to, the common design" of the co-felons. *Mumford,* 19 Md.App. at 644, 313 A.2d 563. Therefore, the trial judge did not err when he refused to give appellant's proposed *Mumford*-type instruction.

**B.**

Did the court err when it denied appellant's motion to suppress the statements he made while in police custody?

■ Appellant contends that the confessions he gave were the products of "coercion" and therefore were involuntary. As appellant points out, a statement given by a defendant in police custody is admissible only if it is (1) voluntary under Maryland non-constitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda.* See *Hof v. State,* 337 Md. 581, 597–98, 655 A.2d 370 (1995).

■ In determining whether a defendant's statement is voluntary under both Maryland's common law and the Due Process Clauses of the Federal and State Constitutions, the totality of the circumstances standard is applicable. *See id.* at 595, 655 A.2d 370. The factors to be considered include

> where the interrogation was conducted, its length, who was present, how it was conducted, its content, whether the defendant was given Miranda warnings, the mental and physical condition of the defendant, the age, background, experience, education, character, and intelligence of the defendant, when the defendant was taken before a court commissioner following arrest, and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

*In re Joshua David C.,* 116 Md.App. 580, 599, 698 A.2d 1155 (1997) (citing *Hof,* 337 Md. at 596–97, 655 A.2d 370).

Appellant has two criticisms of the way he was treated while undergoing police interrogation. First, he complains that the duration of the questioning was too long, and second, he complains that the method of interrogation was improper because he was interrogated by "a relay team of four experienced homicide detectives."

 Taking the last point first, appellant at one point asked Detective McCann to leave the room so that he could have Detective Canales write out a statement for him. That request was honored. Appellant can point to no other instance when he asked an officer to leave the interrogation room. As far as the record shows, he never complained during the interrogation about the number of detectives who questioned him or their persistence. Moreover, appellant never asked the police to discontinue their questioning even though he was advised that questioning would be stopped if he so requested. Under these circumstances, it was not improper conduct for the police to use a team of officers to conduct the interrogation.

 In regard to appellant's complaint that the duration of the interrogation was unduly long, it is important to stress that the testimony of the detectives was unrebutted and, as previously mentioned, all witnesses testified that in their opinions the statements from appellant were given voluntarily. There simply was no direct or circumstantial evidence from which it could be found that appellant's will was overborne or that he confessed because he was sleepy or that the length of the interrogation resulted in an involuntary statement. As shown by *Burch v. State,* 346 Md. 253, 268, 696 A.2d 443, *cert. denied,* —— U.S. ——, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997), a statement obtained from a defendant while in police custody is admissible unless there is some showing of a causal relationship between the alleged improper police conduct and the incriminating statements. *See also Reynolds v. State,* 327 Md. 494, 509, 610 A.2d 782 (1992). At the suppression hearing there was no evidence that appellant would not have made the incriminating statements if he had been given more rest, if the

interrogation sessions had been shorter, or if he had had fewer questioners. Accordingly, the trial court did not err in denying the motion to suppress.

## C.

Did the trial court err in responding to the jury's note?

During deliberations, the jury sent out a note asking, "If the defendant had no prior knowledge of a weapon, is he still guilty of conspiracy to commit robbery with a deadly weapon?" The court and at least two of the jurors then engaged in the following colloquy:

THE COURT: Madam Foreman, I have a note from you that read[s], "If the defendant had no prior knowledge of a weapon, is he still guilty of conspiracy to commit robbery with a deadly weapon?" The issue is this and the question is this;. did the defendant enter into an agreement with Eric Jenkins to commit the crime of robbery with a deadly or dangerous weapon and with the intent that it actually be committed. Does that answer your question?

THE FOREMAN: No.

THE COURT: Let me try this again. Did the defendant enter into an agreement to commit robbery with a deadly or dangerous weapon and, if so, did he enter into that agreement with the intent that it actually take place.

A JUROR: I'm satisfied.

THE COURT: Is there anyone who doesn't understand that?

A JUROR: Your Honor, could he enter into the agreement to commit without -

THE COURT: What was the agreement?

A JUROR: To commit robbery.

THE COURT: No, to commit a robbery with a deadly or dangerous weapon. Does everybody understand this? My favorite expression these days, you've seen the AT & T commercials on TV. I can never think of this man's name. It's about long distance. On one of them, one of those

sessions, he's trying to explain this and people are asking questions and he looks at the camera and says am I being unclear. My question to you is am I being unclear?

Is there anyone now who does not understand that? Sir, do you understand it?

A JUROR: I'm satisfied with what you said, but I still— the question was he entered into an agreement to commit a crime with a dangerous weapon and -

THE COURT: With the intent that it actually be committed. That's the question.

A JUROR: Okay.

(Punctuation added.)

At a bench conference that followed this colloquy, defense counsel did not object to the court's answer to the note. She did request, however, that the court re-instruct the jury on the elements of the crime of robbery with a deadly weapon. Defense counsel observed: "I think the question involves the weapon. The weapon is an element." The court refused, stating:

> When I gave them that instruction originally I explained to them and read to them from the instructions what a deadly weapon was, and it was any object, any object capable of causing death or serious bodily harm. Right out of the book, right out of the book. It's not the robbery that they're hung up on. It's the weapon, and I read to them right out of the book.
>
> MS. SULLIVAN [DEFENSE COUNSEL]: But my request to Your Honor as to whether or not to re-read the robbery with a deadly weapon instruction -
>
> THE COURT: Don't need it, because the only issue that they were concerned about was the deadly weapon, and the deadly weapon I read verbatim right out of the book.
>
> MS. SULLIVAN: But they might think, may think the robbery with a deadly weapon charge, which is further down, isn't the same element as conspiracy to rob with a deadly weapon, and the robbery with a deadly weapon part of the conspiracy is to enter -

THE COURT: Counsel, the only question they had was on the conspiracy.

MS. SULLIVAN: I understand that, but -

THE COURT: That's what I talked to them about. That's as far as I was going. Thank you. File that, would you please.

MS. SULLIVAN: Can you note my exception. . . .

On appeal, appellant stresses that, if he had no prior knowledge of a weapon, he could not have entered into an agreement with Jenkins that the crime of robbery with a deadly weapon be committed. Therefore, he contends that the trial court should have answered the jury note by saying, "The answer to your question is, No." In support of that argument, appellant contends:

> Here, the underlying substantive crime was not robbery, but robbery *with a deadly or dangerous weapon.* The note sent by the jury, . . . strongly suggests that one or more of the jurors found as a fact that [a]ppellant had no prior knowledge of weapon or, at the very least, had a reasonable doubt as to whether [a]ppellant had such knowledge. If [a]ppellant had no prior knowledge of a weapon, he could not have had entered into an agreement with Jenkins with the intent that the crime of robbery with a deadly or dangerous weapon be committed.

(Emphasis in original.)

 The issue appellant now raises was not raised in the trial court. Trial counsel did not assert below that the answer to the note should have been "No." Therefore, the issue presently raised by appellant as to the jury instruction is waived, having not been preserved. *See* Md. Rule 8–131(a).

 Appellant argues, in the alternative, that even if the issue is deemed unpreserved, we should notice "plain error" under Maryland Rule 4–325(e). In this case, Judge Johnson did not commit error, plain or otherwise. The trial judge emphasized in his colloquy with the jury that in order for there to be a conviction the agreement must not have been

merely an agreement to commit a simple robbery but instead an agreement to commit a robbery with a dangerous or deadly weapon. He used the Socratic method to convey this information, and it is clear from the dialogue between the trial judge and the jurors that he succeeded in conveying to them the concept that, in order to commit the crime of conspiracy to commit a robbery with a deadly or dangerous weapon, there must be an agreement "to commit a robbery with a deadly or dangerous weapon." Although Judge Johnson did not say so specifically in his answer to the note, common sense dictates that one must know of the existence of a dangerous or deadly weapon in order to have an agreement with a third party concerning such a weapon.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**